734 So.2d 901 (1999)
Paul W. BAXTER and Mrs. Kathy R. Baxter
v.
SONAT OFFSHORE DRILLING INC.
No. 98 CA 1054.
Court of Appeal of Louisiana, First Circuit.
May 14, 1999.
*903 Ralph Brewer, Baton Rouge, for Plaintiff-Appellant Paul W. Baxter.
Timothy C. Cerniglia, New Orleans, for Defendant-Appellee Sonat Offshore Drilling, Inc.
Before: CARTER, C.J., SHORTESS, J., and Edward A. de la HOUSSAYE,[1] J. Pro Tem.
SHORTESS, J.
Paul W. Baxter (plaintiff) filed suit under the Jones Act[2] against his employer, *904 Sonat Offshore Drilling, Inc. (defendant), alleging he was injured on December 30, 1993, while in the service of the semisubmersible oil rig DF-77.[3] Plaintiff alleged in the petition that he was struck in the back of the head while working on the vessel and "to this day has not been informed and has been unable to find out what struck him." He contended he sustained serious injuries due to defendant's fault and the unseaworthiness of the vessel.
After a six-day jury trial, the jury rendered a verdict finding defendant was not negligent and the vessel was not unseaworthy. The trial court rendered judgment in accordance with the verdict and dismissed plaintiffs suit. Plaintiff appeals, alleging nine assignments of error.

FACTUAL BACKGROUND
In December 1993 defendant hired plaintiff as a roustabout on its offshore drilling rig DF-77. Plaintiff worked one seven-day hitch, went home for fourteen days, then came back for his second hitch on December 28. Kerr McGee owned the rig, and it required all employees leaving for the rig on December 28 to give urine samples at its shore base for a drug screening. According to Richard E. Dennis, an employee of Security Services U.S.A., Limited, who collected the samples, plaintiff was very irritated with the test procedures. He testified plaintiff threatened to sue if the results were positive, although plaintiff denied that. A result of more than 300 nanograms per milliliter' is considered a positive result for codeine. An analysis of plaintiffs urine showed it contained 10,120 nanograms per milliliter of codeine.[4]
On the same day plaintiffs positive test results were sent to Kerr McGee, December 30, plaintiff was found lying face down on a walkway on the blowout preventer (BOP) deck. Dwin Allen Runge, the vessel's medic, was called. Plaintiff was conscious but still lying face down when Runge arrived. Plaintiff's hard hat was about two feet from him and his jacket was near his head. Runge knelt by plaintiff and examined him. Plaintiff was oriented as to time, person, and place. Speaking in a very low voice, he told Runge he heard a loud noise, like an explosion, and the next thing he knew he was lying face down and his head and neck hurt. Runge's examination of plaintiff revealed no blood or scrapes on plaintiff's scalp. He found a discolored spot on plaintiffs scalp that Runge thought was a bruise and a bump at the base of plaintiff's skull. Runge stated he had no idea how long the bump had been on plaintiffs head or even what caused it. Roy Alemand, Kerr McGee's senior drilling foreman, arrived at the scene after Runge and then left to call for a medivac helicopter. Before the helicopter arrived, plaintiff told Runge he remembered going down stairs, picking up his jacket, and hearing a loud sound.
Billy Jenkins, second-in-command on the rig, went to the scene with Runge. He did not notice plaintiff's jacket but saw his brand new hard hat. He examined the hat and found no marks on it. After plaintiff was taken to the treatment room on a stretcher, Jenkins felt the back of plaintiff's head and neck. He found nothing unusual. He stated if there was a bump on plaintiff's head, "it was no more than something like you'd be born with."
*905 John B. Castilaw, Kerr McGee's offshore installation manager who was in charge of the rig, arrived at the scene a few minutes before plaintiff was taken to the treatment room. Plaintiff appeared fully conscious.
Plaintiff was flown by helicopter to Terrebonne General Medical Center in Houma. He was assessed upon admission as alert and oriented. He told the nurse who completed the admission form that he was bending to pick up his jacket when something hit him in the back of the head. Dr. Sherif K. Sakla examined plaintiff and found him "slightly sluggish" but "very fluent." He was alert and oriented as to time place, space, year, and president, but he claimed to have no memory of the incident. Sakla found a bruise on the back of plaintiff's head, behind his right ear. He ordered a CAT scan, which was negative. Because plaintiff's senses seemed to be dulled, he ordered him admitted for observation of a possible concussion and called for a consultation by a neurosurgeon. He stated that doctors give their patients the benefit of the doubt and admit them on the face value of their complaints, even if their gut feeling is that those complaints are exaggerated.
Dr. Carson McKowen, a neurosurgeon, examined plaintiff at Sakla's request. He testified Sakla was concerned that plaintiff was "faking." McKowen found no objective evidence consistent with someone being rendered unconscious by a blow to the head. The only objective finding was tightness of the neck muscles, which could have been caused by the helicopter ride. He testified plaintiff "sounded like he was interested in being injured."
Plaintiff testified that on the day of the incident, someonehe was not sure who asked him to check the BOP's. He went down some stairs and then everything went blank. He testified the next thing he remembered was waking up at Terrebonne General about twelve hours later. He stated he does not remember talking to anyone during those twelve hours.
McKowen stated it was medically inconsistent for plaintiff to remember the incident on admission but not remember it four hours later. Nurses assessed plaintiff every three to four hours after his admission and found him alert and oriented. McKowen believed the manner in which plaintiff claimed amnesia was "inappropriate for someone who has truly been knocked unconscious and had amnesia surrounding a traumatic event."
Defendant retained a neurosurgeon, Dr. Carlos Pisarello, to review plaintiff's medical records and the depositions in this case. He showed the jury a CAT scan film of someone diagnosed with a concussion and compared it to plaintiff's film. He stated plaintiffs CAT scan was completely normal, which proved, in his opinion, that plaintiff "must have" faked being found unconscious or halfway conscious. "[T]he CAT Scan doesn't lie," he testified. He further opined that it was "completely impossible" for someone to recall the details of an accident and then have total amnesia of the event a few hours later. He also noted that someone who regains consciousness while lying face down will, as a reflex action, turn over rather than continue to lie face down and that someone who has just regained consciousness will be disoriented and incoherent, unlike plaintiff herein.
At trial plaintiff testified all he knew about the accident was one minute he was walking, and the next thing he knew, he awakened in the hospital. He had no idea how the accident happened. He agreed he could have blacked out, fallen backward, and hit his head on a steel wall or the deck. He stated that the incident was similar to a drug-induced blackout he once suffered but that the blackout on the rig was not drug-induced.
Jenkins conducted an investigation for Sonat but found nothing that could have caused plaintiff to fall and nothing that could have struck him in the head. He stated there was no equipment that could fall, swing, break, or cause injury on the *906 BOP deck. Nothing was broken or out of place on the wire tray or rack over the walkway where plaintiff was found. Alemand investigated the accident for Kerr McGee. He agreed nothing on the wire tray was disturbed. The floor was clean, and there was nothing that could have fallen and struck plaintiff's head. Calvin Barnhill, an expert in petroleum engineering, drilling operation, and machinery in general, testified there were no moving parts, no defective condition on the deck, and nothing that could injure anyone short of the wire rack itself falling.
Runge testified that after plaintiff left on the helicopter, he went back to the BOP deck and tried to determine the cause of the accident. The walkway was clean and dry, there were no obstructions, oil, or water on the deck, and no frayed or pulled wires overhead. He lay down on the walk-way where he found plaintiff and saw only one possibilitya pipe that came out of the bulkhead just above waist level and extended six to eight inches from the wall. It made a ninety-degree downturn and had an endcap on it. He theorized that if plaintiff had bent down to reach for his jacket, he might have struck the pipe when he tried to straighten up. He found nothing that could have caused the loud noise plaintiff mentioned. He stated it was just as possible that plaintiff had blacked out and struck his head as it was that he had struck his head on the pipe.
Castilaw also tried unsuccessfully to determine a cause of the accident. He checked the wire tray but found nothing, not even the dust, had been disturbed. He stated nothing could fall from the drill floor above the BOP deck because the drill floor is solid.

PLAINTIFF'S ASSIGNMENTS OF ERROR REGARDING JURY INSTRUCTIONS ON LIABILITY
Plaintiff contends the jury was misled and confused by the jury instructions given by the trial court. Louisiana Code of Civil Procedure article 1792(B) requires the trial court to instruct the jurors on the law applicable to the cause submitted to them, citing only correct applicable legal principles.[5] The trial court is responsible for reducing the possibility of confusing the jury and may exercise the right to decide what law is applicable to prevent counsel from arguing law the trial court deems inappropriate.[6]
The sufficiency of a jury charge must be determined in light of the charge as a whole. The court is not required to give the precise instruction submitted by either party, but must give instructions that properly reflect the applicable law in light of the facts of the particular case. Even if the requested instructions are fair statements of the law, the trial court need not include them verbatim but may strike a fair balance so that no one issue is unduly emphasized.[7] The charge must correctly state the law and be based on evidence adduced at trial.[8]
Whether to include a requested jury instruction is a matter within the wide discretion of the trial court, and its decision will not be overturned absent abuse of that discretion.[9] An appellate court must exercise great restraint by setting aside the verdict only where the instructions misled the jury to such an extent as to prevent it from doing justice.[10] When a *907 trial court abuses its discretion and the instructions are prejudicially misleading, however, the presumption of regularity afforded a jury verdict is tainted, and the appellate court must undertake a de novo review of the record and implement its own judgment based on the evidence.[11]

Assignment of Error No. 2: Res Ipsa
Plaintiff contends the trial court erred in refusing to instruct the jury on the doctrine of res ipsa loquitur, an evidentiary doctrine used to prove a tort claim by circumstantial evidence. The doctrine should be applied sparingly and only in exceptional cases where the demands of justice make that application essential.[12] It generally requires three elements: 1) the circumstances surrounding the accident are so unusual that, in the absence of other pertinent evidence, there is an inference of negligence on the part of the defendant; 2) the defendant had exclusive control over the agency, instrumentality, or conditions that caused plaintiff's injury; and 3) the circumstances are such that the only reasonable and fair conclusion is that the accident was due to defendant's breach of duty.[13] The second element has not been strictly applied, but is satisfied if the circumstances indicate that defendant's negligence, and not other plausible explanations, was the probable cause of the accident.[14]
In order to utilize this doctrine, the plaintiff must establish a foundation of facts on which the doctrine may be applied.[15] The plaintiff does not have to eliminate all other possible causes or inferences, but he must present evidence that indicates at least a probability that the injury would not have occurred without negligence. The plaintiff must show not only that an accident occurred or that an accident was caused by the negligence of someone, but also that the circumstances warrant an inference of defendant's negligence.[16]
Plaintiff has produced not a scintilla of direct evidence showing defendant was negligent. In order to use the doctrine of res ipsa, he had to establish a foundation of facts showing more likely than not this incident would not have occurred absent defendant's negligence. Based on the evidence presented at trial, we can hypothesize at least five explanations of how plaintiff could be found lying face down on a walkway on the BOP deck: 1) he was intentionally struck by an unknown person; 2) he blacked out and struck his head as he fell; 3) he fell through his own carelessness and struck his head as he fell; 4) he reached down to pick up his jacket and struck his head on the pipe when he tried to straighten up; or 5) he faked an injury. There is evidence that it was possible plaintiff struck his head on the pipe, but plaintiff did not show defendant was negligent in having a pipe in a machinery room on a drilling rig or that the pipe presented a hazard to a reasonably prudent seaman. Indeed, more evidence was presented in support of defendant's theory that plaintiff faked the injury than of any other explanation.[17] *908 Res ipsa loquitur clearly was not applicable under the facts of this case, and the trial court did not err in refusing to give a res ipsa jury instruction.

Assignment of Error No. 3: Burden of Proof under Jones Act
The trial court gave the jury the following instructions regarding the plaintiff's burden of proof under the Jones Act:
Mr. Baxter claims two bas[e]s for recovery. His first basis concerns fault. A person is responsible for damages caused by his fault. To be successful, Mr. Baxter must prove more likely than not that Sonat's fault caused his losses. A company is at fault if one or more of its employees engage in conduct below the standard which the law applies to [its] activities. Generally, a person is required to act with the degree of care that we might reasonably expect from an ordinary person. As Mr. Baxter's employer, Sonat must provide a reasonably safe work place. It must supervise and instruct seam[e]n about safe work methods. It must provide adequate and proper equipment. A company is at fault if its employees engage in conduct below the standard which the law applies to its activities.
In deciding if Sonat's substandard conduct caused Mr. Baxter a loss, you should ask the question: "Did Sonat's substandard conduct play any slight part or contribute in some way to produce a loss?"
Plaintiff contends the trial court should have provided the jury with the background for the passage of the Jones Act and "enlightened the jury as to the extremely slight or featherweight burden of proof that an injured seaman must bear." Our supreme court, however, recently held in Vendetto v. Sonat Offshore Drilling Company[18] that the "loose language of decisions implying a higher standard of care on Jones Act employers" is incorrect and that the standard of care for both Jones Act employers and Jones act seamen is to act as an ordinarily prudent person would act under similar circumstances.[19] The trial court, in instructing the jury that "a person is required to act with the degree of care that we might reasonably expect from an ordinary person," correctly stated the law. This assignment of error has no merit.

Assignment of Error No. 4: Unseaworthiness
The trial court instructed the jury as follows regarding unseaworthiness:
Mr. Baxter's second basis concerns unseaworthiness. As the owner of the DF-77, Sonat must keep the DF-77 seaworthy. To be seaworthy the DF-77 must be reasonably suited for its intended use, its crew must be adequately trained, and it must be adequately equipped.
In order to recover based on an unseaworthy [condition], Mr. Baxter must prove more likely than not that the DF-77 was unseaworthy and the unseaworthy condition played a substantial part in causing an injury. In deciding if an unseaworthy condition on the DF-77 caused Mr. Baxter a loss, you may decide the question in this way:
1) If Mr. Baxter probably would not have suffered a claimed loss without a particular [condition], then you must conclude that the condition did cause the loss.
2) On the other hand, if Mr. Baxter probably would have suffered the injury regardless of the particular condition, then you must conclude that the loss was not caused by that condition.
*909 Plaintiff concedes this is a correct statement of the law but complains on appeal that the trial court failed to adequately emphasize the weight of the duty that the vessel owner or employer owes to the seaman. He contends the court should have informed the jury "of the vulnerable position of each seaman while working aboard a seagoing vessel." As stated above, the trial court must strike a fair balance so that no one issue is unduly emphasized. We find no abuse of discretion in the charge given by the trial court.

Assignment of Error No. 6: Maintenance and Cure
Plaintiff contends the trial court erred in refusing to instruct the jury on the issue of maintenance and cure because plaintiff did not plead his entitlement to maintenance and cure in the petition. Plaintiff argues, however, that his plea for damages for future economic loss and future medical expenses was sufficient to encompass maintenance and cure.
Maintenance and cure is an ancient duty imposed upon the owner of a ship to provide food, lodging, and necessary medical services to seamen who become ill or injured during service to the ship.[20] It is an action ex contractu, pursued via a separate cause of action or theory of recovery than negligence for injuries caused by unseaworthiness of a vessel or Jones Act negligence.[21] A seaman must establish his right to maintenance and cure with that degree of proof required in ordinary cases, which means more than mere speculation or conjecture.[22] In order to recover maintenance, a seaman must present some evidence that he actually incurred expenses for his support.[23] Cure is payment for medical services until maximum medical recovery is reached, i.e., when it appears probable that further treatment will result in no betterment of the seaman's condition.[24]
Defendant paid maintenance and cure to plaintiff from the date of the incident through January 24, 1996. The parties stipulated at trial that defendant paid maintenance of $13,724.48 and cure of $49,019.79, in "discharge of Sonat's Jones Act obligation and general maritime obligation under maintenance and cure." Whether maintenance and cure was sufficiently pleaded or not, we find plaintiff presented no evidence to support a maintenance and cure charge to the jury. Plaintiff offered no evidence of his living expenses to support a claim for maintenance, nor did he offer medical testimony that he was still in need of "cure." In fact, when asked by his counsel on direct examination if his condition was getting better or worse, plaintiff replied, "I think it's maxed out, `cause it's been like about the same way for the last, I'm going to say a year now." We find the trial court did not abuse its discretion in refusing to charge the jury on maintenance and cure.

REMAINING JURY INSTRUCTIONS AND CONCLUSION
We have found the trial court properly charged the jury on res ipsa, the burden of proof under the Jones Act, unseaworthiness, and maintenance and cure. Plaintiff's remaining assignments of error involve damages and comparative fault.[25] *910 We find nothing in the trial court's jury instructions on liability issues that could have tainted the verdict. The mere fact that an accident happened, if it did, did not entitle plaintiff to an inference of negligence through the doctrine of res ipsa loquitur, nor does it support a finding of Jones Act negligence or unseaworthiness. Thus, we must affirm the judgment of the trial court dismissing plaintiff's suit. In light of this determination, we pretermit discussion of the remaining assignments of error.
The judgment of the trial court in favor of Sonat Offshore Drilling, Inc., dismissing the demands of plaintiff, Paul W. Baxter, is hereby affirmed. Plaintiff is cast for all costs.
AFFIRMED.
NOTES
[1] Judge Edward A. de la Houssaye, III, retired, is serving as judge pro tempore by special appointment of the Louisiana Supreme Court.
[2] 46 U.S.C.App. § 688.
[3] Plaintiff's wife, Kathy R. Baxter, joined in the suit seeking damages for loss of consortium. The trial court sustained defendant's exception of no cause of action, finding the Jones Act did not provide for loss of consortium damages. This court affirmed that decision in Baxter v. Sonat Offshore Drilling, Inc., 95-1108 (La.App. 1st Cir.6/28/96) (unpublished).
[4] Codeine is legally available only through a doctor's prescription. Plaintiff had no prescription for codeine, although his wife testified she had given him some cold medicine that might have been prescribed for some other family member and might have contained codeine.
[5] Gardner v. Griffin, 97-379, p. 4 (La.App. 1st Cir.4/8/98), 712 So.2d 583, 586; Dumas v. Harry, 94-19, p. 5 (La.App. 5th Cir.5/11/94), 638 So.2d 283, 287.
[6] Gardner, 97-379 at p. 4, 712 So.2d at 586; McCrea v. Petroleum, Inc., 96-1962, pp. 6-7 (La.App. 1st Cir.12/29/97), 705 So.2d 787, 791.
[7] Sanders v. Bain, 31-362, pp. 2-3 (La.App.2d Cir.12/9/98), 722 So.2d 386, 388-389.
[8] Gardner, 97-379 at p. 4, 712 So.2d at 586; McCrea, 96-1962 at p. 7, 705 So.2d at 791.
[9] Gardner, 97-379 at p. 4, 712 So.2d at 586.
[10] Sanders, 31-362 at p. 3, 722 So.2d at 389.
[11] McLean v. Hunter, 495 So.2d 1298, 1304 (La.1986); Gonzales v. Xerox Corp., 320 So.2d 163, 165 (La.1975).
[12] Day v. National U.S. Radiator Corp., 241 La. 288, 300, 128 So.2d 660, 665 (1961); Boudoin v. Crawford and Marshall, Ltd., 97-224, p. 28 (La.App. 5th Cir.1/14/98), 709 So.2d 798, 809.
[13] Spott v. Otis Elevator Co., 601 So.2d 1355, 1362 (La.1992).
[14] Id.
[15] Cangelosi v. Our Lady of the Lake Regional Medical Ctr., 564 So.2d 654, 665-666 (La. 1989).
[16] Id. at 666.
[17] In addition to the medical testimony discrediting plaintiff's version of the incident, defendant presented testimony that a roust-about who had been on the rig only nine days would never have been asked to check the BOP's, and thus plaintiff had no reason to be on the BOP deck. Plaintiff's credibility was also impeached by his own admissions that he lied on job applications, doctors' questionnaires, and unemployment insurance applications because he needed money to support his family.
[18] 97-3103, p. 7 (La.1/20/99), 725 So.2d 474, 478.
[19] Id. at pp. 8-9, 725 So.2d at 478-479.
[20] Fox v. Texaco, 97-2126, p. 2 (La.App. 1st Cir.11/6/98), 722 So.2d 1064, 1066.
[21] Id., 97-2126 at p. 3, 722 So.2d at 1067.
[22] Breaux v. Romero & Assoc., 95-691, p. 5 (La.App. 3d Cir.11/2/95), 664 So.2d 683, 686, quoting Sylvester v. Offshore Food Serv., 217 So.2d 430, 436 (La.App. 1st Cir.1968).
[23] Steed v. Stokes Towing Co., 96-1008, pp. 4-5 (La.App. 5th Cir.6/30/97), 709 So.2d 790, 793, writ denied, 97-2036 (La.11/14/97), 703 So.2d 626.
[24] Murphy v. L & L Marine Transp., 97-33, p. 7 (La.App. 5th Cir.5/28/97), 695 So.2d 1045, 1048.
[25] Plaintiff styles his first assignment of error as a problem of evidence and trial order. He complains that defense counsel's use of a placard to highlight certain medical testimony constituted improper argument. Plaintiff failed to object to use of this placard until the second day of trial. Furthermore, the information contained thereon was directed to defense of the damages issue.