PETTIGREW, J.
 

 | gPlaintif'f, David Wayne Everett, appeals a judgment dismissing, with prejudice, his claim for damages arising out of a horseback riding accident in which, allegedly, he sustained injuries after he fell off of a horse owned by defendants, Lawrence Rivett and Annette Rivett. For the reasons set forth more fully below, we affirm.
 

 FACTS AND PROCEDURAL HISTORY
 

 At all times pertinent hereto, the Rivetts lived in Pointe Coupee Parish and owned four horses that they kept for recreational purposes on their 13 acres of property. Approximately one year prior to the incident that gave rise to this lawsuit, Mr. Rivett had purchased one of the horses, Breeze, for his wife. Mr. Rivett described Breeze as a 12-13-year-old horse that was used for barrel racing and pole events by her prior owner, a young girl who was approximately nine years old at the time she owned the horse. Mr. Rivett testified that he rode Breeze numerous times, even with his five-year-old daughter, and never had any problems with Breeze acting up, bucking, or being skittish. Mrs. Rivett indicated that she rode Breeze at least once a week from the time they got her and that Breeze had never been uncontrollable or hard to handle. In fact, when asked about the four horses they owned, Mrs. Rivett opined that Breeze was the calmest of the group.
 

 According to the record, the week prior to the incident, Mr. Everett and Randy Gremillion, Mrs. Rivett’s sister, had gone to the Rivetts’ house late one evening and Mr. Everett inquired about riding the horses. Mrs. Rivett told him no, because it was getting dark. Mr. Everett then asked if they could come back on the weekend to ride. The following Saturday, March 11, 2006, Mrs. Rivett received a phone call from Mr. Everett and Randy, indicating that they were on their way to the Rivetts’ house, to ride horses.
 

 When Mr. Everett and Randy arrived on the day in question, Breeze was already saddled, properly by all accounts, as Mrs. Rivett had been riding her. Mrs. Rivett testified that during her 15 minute ride, she did not have any problems with Breeze. Mr. Everett asked if he could ride Breeze, and Mrs. Rivett obliged. There is some dispute as to exactly what Mr. Everett told Mrs. Rivett regarding his prior experience riding horses. Mrs. Riv-ett indicated that before she could even ask Mr. Everett if he had any experience lswith horses, he told her that he loved riding horses and that he loved to run horses. To the contrary, Mr. Everett testified that he told Mrs.'Rivett he had only ridden a horse one time before when he was about nine or ten years old. However, by his own admission, Mr. Everett led Mrs. Rivett to believe that he knew how to stop and turn a horse and that he knew the basics of horseback riding. According to Mr. Everett, he explained to Mrs. Riv-ett what he knew and then she filled in a few things that he did not know. Mrs. Rivett showed him how to use the reins and told him not to slap or hit Breeze and not to whistle or make a smacking noise as these actions would cause Breeze to run.
 

 Also in dispute is the behavior of Breeze just prior to the accident as Mr. Everett was riding her. Mr. Everett testified that as soon as he “nudged her a little bit, she took off trotting, and once she hit the open field, she just took off.” He indicated that eventually, he was able to slow her down and turn her around, although Breeze never came to a complete stop. Once Breeze was turned around, she took off again,
 
 *459
 
 “wide open” towards a telephone pole. As Breeze turned sharply away from the telephone pole, Mr. Everett slid out of the saddle. When asked why he did not stop Breeze and simply get off of the horse when she slowed down, Mr. Everett replied, “I honestly don’t know. It didn’t cross my mind at the time.”
 

 Mrs. Rivett’s testimony regarding these events differs somewhat in that she recalls Breeze walking the width of their property and the width of their neighbor’s property before she began to run. Mrs. Rivett indicated she was unable to tell what caused Breeze to run. When asked what happened next, the following colloquy occurred:
 

 [Mrs. Rivett:] She ran to the back, and I noticed the horse came to a stop, turned around, and began running back to the front where we were — where I was standing.
 

 Q. Are you certain that the horse came to a complete stop, or did it turn while it was still running?
 

 [Mrs. Rivett:] It did not turn while it was still running. It came to a stop, then the horse turned around. I had assumed at that point and time that David had control of the horse, had stopped it and had turned it around, and I was also going to further instruct him when he would come back, you know, I told you not to run my horse.
 

 Q. Now, did David attempt to get off of Breeze when.Breeze stopped?
 

 | ,([Mrs. Rivett:] No, he did not.
 

 Q. What happened next after Breeze stopped? Was it turned around before it stopped or after?
 

 [Mrs. Rivett:] It stopped and then the horse turned around and then it began running again.
 

 Q. Now, did you witness David’s entire ride to the time he fell off?
 

 [Mrs. Rivett:] Yes, I did.
 

 Q. Now, tell us about how he fell off. What did you see?
 

 [Mrs. Rivett:] The horse was running back, and it took a right-hand turn, and when it turned, David fell off.
 

 Q. ... Did [Breeze] buck him off?
 

 [Mrs. Rivett:] No, sir.
 

 [[Image here]]
 

 Q. David just fell off?
 

 [Mrs. Rivett:] He just fell off.
 

 Q. Did Breeze ever buck during David’s ride?
 

 [Mrs. Rivett:] Never.
 

 Q. Did Breeze ever come up and down in the front during David’s ride?
 

 [Mrs. Rivett:] Never.
 

 Q. Did Breeze ever throw his head down in an attempt to make David come off the front?
 

 [Mrs. Rivett:] Never.
 

 Q. Did Breeze ever try to find a fence and scrape him against the fence or anything like that?
 

 [Mrs. Rivett:] Never.
 

 Q. Did you see Breeze soon after David fell off?
 

 [Mrs. Rivett:] I seen Breeze pass by me and continue to run in the direction of my land....
 

 Q. Okay. Was the saddle disrupted in any way when you saw Breeze pass by you?
 

 [Mrs. Rivett:] No, sir.
 

 |fiQ. It was still on straight?
 

 [Mrs. Rivett:] Yes, sir.
 

 As a result of the injuries he sustained in this accident, Mr. Everett filed the instant suit against the Rivetts and their insurer, State Farm Fire and Casualty Insurance. The matter proceeded to a jury trial on March 10-11, 2009. Before jury selection even began, the trial court was asked to
 
 *460
 
 address the jury instruction concerning La. Civ.Code art. 2321, as amended by La. Acts 1996, No. 1, § 1, and its implications as it related to the burden of proof for the plaintiff in proving liability for damages caused by a horse. After hearing argument from both sides and considering the applicable law, the trial court decided to adopt the jury instruction found in 18 H. Alston Johnson, III, Louisiana Civil Law Treatise: Civil Jury Instructions § 9.01 (2d ed.2001), regarding liability for harm caused by domesticated animals. The charge in question, which was incorporated into the trial court’s jury instructions at the end of the instant case, provides as follows:
 

 In this case, the activity in question is the ownership of a domesticated animal, namely a_The Civil Code, in Article 2321, provides a standard applicable to this activity:
 

 The owner of an animal is answerable for the damage caused by the animal.
 

 In order to recover under this standard, the plaintiff must prove that:
 

 (a) the animal in question was owned by the defendant;
 

 (b) the animal presented an unreasonable risk of harm;
 

 (c) the defendant knew or, in the exercise of reasonable care, should have known of that risk of harm;
 

 (d) the damage could have been prevented by the exercise of reasonable care, and the defendant failed to exercise such reasonable care; and
 

 (e) he was damaged as a result of the animal’s behavior.
 

 If plaintiff proves these five things by a reasonable preponderance of the evidence, the owner of the animal can escape liability only if he shows that the harm was caused solely by an independent cause not traceable to the defendant, such as the fault of the injured persons, or the fault of a third person, or by a fortuitous event beyond the control of anyone.
 

 At the conclusion of the evidence in this case, the jury found in favor of the Rivetts, concluding that Breeze did not present an unreasonable risk of harm. On April |fi6, 2009, the trial court signed a judgment in accordance with the jury’s findings, dismissing, with prejudice, Mr. Everett’s claims against the Rivetts and State Farm. This appeal by Mr. Everett followed, wherein he assigned the following specifications of error:
 

 1. The trial court erred in instructing the jury the proper standard of proof under LSA-C.C. art. 2321 for damages caused by a horse required proving that the horse “presented an unreasonable risk of harm” and the erroneous jury instruction significantly contributed to the verdict.
 

 2. The trial court erred in not instructing the jury [on] the legal definition of “unreasonable risk of harm” and the erroneous jury instruction significantly contributed to the verdict.
 

 3. The trial court erred by including the requirement that plaintiff prove the horse “presented an unreasonable risk of harm” in the jury interrogatories/verdict form.
 

 4. The trial court erred in not instructing the jury as to ordinary negligence of the individual defendant tortfeasors and the erroneous jury instruction significantly contributed to the verdict.
 

 5. The trial court erred in not including ordinary negligence in the verdict form and the erroneous jury instruction significantly contributed to the verdict.
 

 DISCUSSION
 

 The crux of Mr. Everett’s case on appeal is that his claims against the Rivetts and
 
 *461
 
 State Farm were based on ordinary negligence pursuant to La. Civ.Code art. 2321 and that the burden of proof for the jury instructions and the verdict form should have tracked the language of Article 2821. Alternatively, Mr. Everett contends that “liability/fault should have been resolved and jury instructions and jury [i] interrogatories given explaining the duty/risk analysis; neither of which require nor even address that the animal presented an unreasonable risk of harm.” Mr. Everett argues it was reversible error that the jury was not instructed as to ordinary negligence and the duty/risk analysis to determine fault/liability.
 

 Louisiana Code of Civil Procedure article 1792(B) requires the trial court to instruct jurors on the law applicable to the cause submitted to them. The trial court is responsible for reducing the possibility of confusing the jury and may exercise the right to decide what law is applicable and what law the trial court deems inappropriate.
 
 Adams v. Rhodia, Inc.,
 
 2007-2110, pp. 5-6 (La.5/21/08), 983 So.2d 798, 804;
 
 Baxter v. Sonat Offshore Drilling Inc.,
 
 98-1054, p. 6 (La.App. 1 Cir. 5/14/99), 734 So.2d 901, 906. The sufficiency of a jury charge must be determined in light of the charge as a whole. The charge must correctly state the law and be based on evidence adduced at trial.
 
 Baxter,
 
 98-1054 at 6, 734 So.2d at 906.
 

 Ordinarily, factual findings of the jury are accorded great weight and may not be disturbed by the appellate court in the absence of manifest error.
 
 Rosell v. ESCO,
 
 549 So.2d 840 (La.1989). However, when the jury verdict is based on instructions that are faulty in a critical regard, the verdict is tainted and not entitled to a presumption of regularity.
 
 Dupuy v. Rodriguez,
 
 620 So.2d 397, 399 (La.App. 1 Cir.),
 
 writ denied.
 
 629 So.2d 352 (La.1993). Adequate jury instructions are those that fairly and reasonably point out the issues and provide correct principles of law for the jury to apply to those issues. If the trial court omits an applicable, essential legal principle, its instruction does not adequately set forth the issues to be decided by the jury and may constitute reversible error.
 
 Adams,
 
 2007-2110 at 6, 983 So.2d at 804. Correlative to the trial court’s duty to charge the jury as to the law applicable in a case is a responsibility to require that the jury receives only the correct law.
 
 Id.; Melancon v. Sunshine Construction, Inc.,
 
 97-1167, p. 6 (La.App. 1 Cir. 5/15/98), 712 So.2d 1011, 1016. “When the reviewing court finds that an erroneous jury instruction probably contributed to the verdict, the verdict must be set aside on appeal. The reviewing court may then conduct an independent investigation of the facts from the record before it and render judgment on the merits.”
 
 Dupuy,
 
 620 So.2d at 399 (citations omitted).
 

 The liability for damage caused by animals is regulated by La. Civ.Code art. 2321, which after its amendment by 1996 La. Acts, 1st Ex.Sess., No. 1, § 1, now reads as follows:
 

 The owner of an animal is answerable for the damage caused by the animal. However, he is answerable for the damage only upon a showing that he knew or, in the exercise of reasonable care, should have known that his animal’s behavior would cause damage, that the damage could have been prevented by the exercise of reasonable care, and that |8he failed to exercise such reasonable care. Nonetheless, the owner of a dog is strictly liable for damages for injuries to persons or property caused by the dog and which the owner could have prevented and which did not result from the injured person’s provocation of the dog. Nothing in this Arti
 
 *462
 
 cle shall preclude the court from the application of the doctrine of res ipsa loquitur in an appropriate case. [Emphasis added.]
 

 In the recent case of
 
 Pepper v. Triplet,
 
 2003-0619 (La.1/21/04), 864 So.2d 181, the Louisiana Supreme Court performed a textual analysis of Article 2321, beginning with
 
 Holland v. Buckley,
 
 305 So.2d 113 (La.1974), the seminal case that abrogated the “first bite free” negligence analysis and adopted a strict liability theory in animal cases.
 
 Holland
 
 had held that when a domesticated animal harms a person, the master of the animal is presumed to be at fault; in the “crowded society of today, the burden of harms caused by an animal should be borne by his master who keeps him for his own pleasure or use rather than by an innocent victim injured by the animal.”
 
 Holland,
 
 305 So.2d at 119-120. However, the
 
 Pepper
 
 court did not precisely adopt this bright-line approach.
 

 Instead, the
 
 Pepper
 
 court drew heavily on the strict liability theory as applied to inanimate objects in
 
 Loescher v. Parr,
 
 324 So.2d 441 (La.1975).
 
 Loescher
 
 had held that the guardian of a thing is liable when the plaintiff proves that the thing that caused his damage was in the garde of the defendant, that there was a defect or vice in the thing; i.e., an unreasonable risk of harm was created by it, and that the damage occurred because of this defect or vice, unless the guardian can prove the damage was caused by the fault of the victim, by the fault of a third person, or by an irresistible force.
 
 Loescher,
 
 324 So.2d at 449.
 

 Subsequent to
 
 Loescher,
 
 the supreme court in
 
 Boyer v. Seal,
 
 553 So.2d 827, 834 (La.1989), applied the unreasonable risk of harm principle to animals, reasoning as follows:
 

 There are various policies supporting the unreasonable risk principle: As
 
 Loescher
 
 observes, the person who has the guardianship and usually the enjoyment of the person or thing should bear the cost of damage caused by risks they create rather than the innocent victim. Further, it is thought that the guardian is in a better position to anticipate, detect, guard against, and insure against these risks, making him a better risk spreader and more efficient conductor of the deterrent effects of civil liability. A [ 9competing policy, however, is that the guardian should not be responsible for protecting against all risks; some risks are relatively too small to require him to protect others therefrom. Thus, if the unreasonable risk of harm principle were to be abolished in the cases involving liability for animals, these policies would tend to be defeated or at least not promoted and owners would be made insurers against loss from any risk, no matter how insignificant or socially tolerable the risk might be. We see no reason that animal owners should be treated less favorably than owners of buildings and guardians of inanimate things under strict liability conceptions of the Civil Code. Moreover, it would appear that doing so might undermine the principle’s application to strict liability under other delictual articles of the Code. Consequently, we conclude that the unreasonable risk of harm principle should be maintained in animal cases in the interest of the continued manageable and harmonious application of strict liability under the Civil Code.
 

 Finally, the
 
 Pepper
 
 court studied the effect of the 1996 amendment to Article 2321, which appeared to confer an ordinary negligence standard on the owners of all animals except dogs, for whose owners the strict liability standard was retained. 1996 La. Acts, 1st Ex.Sess., No. 1, § 1. The court found that despite the legislature’s omission of terms such as “strict liability”
 
 *463
 
 or “unreasonable risk of harm,” the amendment nonetheless effected no “practical change in how the courts should apply Article 2321 to dog claims.”
 
 Pepper,
 
 2003-0619 at 18, 864 So.2d at 194. The court found that the “could have prevented” clause of the 1996 amendment showed adequate legislative intent to retain the pre-amendment concepts of strict liability and unreasonable risk of harm, with respect to dog owners only.
 
 Pepper,
 
 2003-0619 at 19, 864 So.2d at 194.
 

 The court summarized its analysis as follows:
 

 [T]he legislature’s 1996 amendment of Article 2321 simply changes the law to make
 
 Holland
 
 and the strict liability doctrine no longer applicable to animals other than dogs. Furthermore, as we explained in
 
 Boyer,
 
 the unreasonable risk of harm principle represented, in effect, a limitation, albeit perhaps a partially jurisprudential one, upon the reach of strict liability, so the owner of an animal is not required to insure against all risk or loss. We detect no legislative retreat from that principle in the 1996 amendment to Article 2321.
 

 Accordingly, we hold that the method established in Louisiana for determining strict Lability was continued by the legislature with regard to dog owners in La. Civ.Code art. 2321, and that, to ascertain whether the owner could have prevented the injury or damage, the plaintiff must establish that the dog posed an unreasonable risk of harm. [Emphasis added.]
 

 Pepper,
 
 2003-0619 at 20, 864 So.2d at 195.
 
 See also
 
 Joseph F. Piacun, Comment,
 
 The Abolition of Strict Liability in Louisiana: A Return to a Fairer Standard or an Impossible Burden on Plaintiffs?,
 
 43 Loy. L.Rev. 215 (1997) (hereinafter
 
 The Abolition of Strict Liability in
 
 Louisiana) (noting that the 1996 revision to Article 2321 has resulted in an ordinary negligence standard for owners of all animals, except dogs, whose owners continue to be governed by a strict liability standard).
 

 In the instant case, the trial court instructed the jury that in order to prove liability/fault, Mr. Everett was required to prove, among other things, that Breeze presented an unreasonable risk of harm. Mr. Everett argues on appeal that because his claims against the Rivetts and State Farm were based on ordinary negligence pursuant to Article 2321, the jury should have been instructed regarding same and the duty/risk analysis. We agree.
 

 Viewing the trial court’s jury instructions in the instant case in light of the 1996 amendments to Article 2321 and the supreme court’s holding in
 
 Pepper,
 
 it is evident that the trial court failed to properly instruct the jurors with the correct standard with which to evaluate defendants’ conduct. Glaringly omitted is any reference to the traditional duty/risk analysis or the five elements necessary in order for liability to attach in an ordinary negligence claim. Because this case did not involve a dog, but rather an alleged injury sustained during a horseback riding incident, we conclude the trial court erred in giving the jury an instruction that required a finding that the animal in question posed an unreasonable risk of harm. Furthermore, we find that such instruction tainted the jury’s verdict and, therefore, it must be set aside. Accordingly, we will now consider the case
 
 de novo,
 
 without according any weight to the factual findings of the erroneously instructed jury.
 
 See Dupuy,
 
 620 So.2d at 399.
 

 In order for liability in negligence to attach under our traditional duty/ risk analysis, a plaintiff must prove five separate elements: (1) the defendant had a
 
 *464
 
 duty to conform his or her conduct to a specific standard of care (the duty element); (2) the defendant failed to conform his or her conduct to the appropriate standard (the breach of duty element); (8) the defendant’s substandard conduct was a cause-in-fact of the |n plaintiffs injuries (the cause-in-fact element); (4) the defendant’s substandard conduct was a legal cause of the plaintiffs injuries (the scope of liability or scope of protection element); and, (5) actual damages (the damages element).
 
 Rando v. Anco Insulations Inc.,
 
 2008-1163, p. 26-27 (La.5/22/09), 16 So.3d 1065, 1086. A negative answer to any of the elements of the duty/risk analysis prompts a no-liability determination.
 
 Joseph v. Dickerson,
 
 99-1046, pp. 6-7 (La.1/19/00), 754 So.2d 912, 916. Under a duty/risk analysis, the court must view the defendant and plaintiff as individual and unique social actors, taking into account the conduct of each party and the peculiar circumstances of the case.
 
 Pepper,
 
 2003-0619 at 27, 864 So.2d at 199.
 

 One of the necessary considerations in the duty/risk analysis is to determine what, if any, duties were owed by the respective parties.
 
 Mart v. Hill,
 
 505 So.2d 1120, 1122 (La.1987). Generally, there is an almost universal legal duty on the part of a defendant in a negligence case to conform to the standard of conduct of a reasonable person in like circumstances.
 
 Boykin v. Louisiana Transit Co.,
 
 96-1932, p. 10 (La.3/4/98), 707 So.2d 1225, 1231. Whether a legal duty exists, and the extent of that duty, depends on the facts and circumstances of the case, and the relationship of the parties. See
 
 Socorro v. City of New Orleans,
 
 579 So.2d 931, 938 (La.1991).
 

 A duty has been defined as “an obligation, to which the law will give recognition and effect, to conform to a particular standard of conduct toward another.”
 
 Morris v. Orleans Parish School Bd.,
 
 553 So.2d 427, 429 (La.1989). The imposition of a duty depends on a case-by-case analysis.
 
 Gresham v. Davenport,
 
 537 So.2d 1144, 1147 (La.1989);
 
 Laiche v. Kohen,
 
 621 So.2d 1162, 1163 (La.App. 1 Cir.1993). Duty is a question of law. The inquiry is whether the plaintiff has any law — statutory, jurisprudential, or arising from general principles of fault — to support his claim.
 
 Griffin v. Danos and Curole Marine Contractors, Inc.,
 
 94-1789, p. 6 (La.App. 1 Cir. 5/5/95), 655 So.2d 525, 528,
 
 writ denied,
 
 95-1383 (La.9/15/95), 660 So.2d 451.
 

 Applying those principles to the instant case, we do not find that Mr. Everett has sufficiently established the elements of a negligence claim against the Rivetts. When the Rivetts allowed Mr. Everett to ride Breeze, they had a duty to do so in a reasonably Imprudent manner. However, pursuant to Article 2321, Mr. Everett had the burden of proving that the Rivetts either knew, or in the exercise of reasonable care, should have known, that Breeze’s behavior would cause damage, that the damage could have been prevented by the exercise of reasonable care, and that they failed to exercise such reasonable care. La. Civ.Code art. 2321.
 
 [1]
 

 
 *465
 
 1 isOn the points bearing on the disposition and characteristics of Breeze, there is much testimony in the record that Breeze was gentle and had been ridden consistently in the past without difficulty by many different people. We have carefully examined the record and find nothing that would indicate Breeze was anything but a gentle animal without any of those quirks of animal nature that would have rendered her dangerous or unsafe in any degree whatsoever. The Rivetts testified that during the year they owned her, she had never been uncontrollable or hard to handle. Moreover, they had no knowledge of any such incidences involving Breeze prior to their ownership. Mrs. Rivett rode Breeze frequently, and there was never any indication that Breeze had a bad disposition or a mean spirit. In fact, Mrs. Rivett described Breeze as the calmest of the four horses they owned. Mr. Rivett testified that he had even ridden Breeze
 
 *466
 
 numerous times with his five-year-old daughter and never had any problems with Breeze acting up or being skittish.
 

 The only expert to testify in this matter, Dr. Dennis French, was accepted by the court in the field of veterinary science, equine behavior. Dr. French examined Breeze and found nothing in his physical exam that would lead him to conclude that Breeze had a propensity to be uncontrollable or skittish. Dr. French also watched a skilled rider take Breeze through a number of maneuvers, all of which Breeze handled well. Dr. French even had the rider put her hands up to the level of the horse’s ears, which is typically an uncomfortable position for most horses, to see how Breeze would react. Breeze did exactly what Dr. French expected her to do, which was refuse to perform the task she was being asked to perform. Dr. French explained that this was a normal reaction for a horse in this situation and acknowledged that even in that uncomfortable moment, Breeze did not buck the rider off or run away uncontrollably. When asked about Breeze’s prior history as a barrel racing horse, Dr. French opined that if a horse is calm, prior history/performance of the horse should not factor into the equation of whether you should allow someone to ride a horse. Dr. French, who is involved with the Therapeutic Riding Association, testified that because of the conditioning that retired race horses and retired barrel racing horses have gone through, the association |uhas used these horses in therapy sessions with mentally and physically disabled children.
 

 As previously discussed, Mr. Everett asked to ride Breeze, and Breeze was in the control of Mr. Everett at the time of the accident, not the Rivetts. Moreover, by Mr. Everett’s own admission, he had an opportunity to stop Breeze and simply get off of the horse when he was able to slow her down and turn her around. But, as Mr. Everett recounted in his testimony, it did not cross his mind at the time.
 

 Based on the facts and circumstances of this case, there is no evidence to suggest that the Rivetts had any knowledge that Breeze had a previous history of a vicious temperament. Thus, there is no breach of the duty owed by the Rivetts to Mr. Everett, and, consequently, there can be no finding of liability under the duty/risk analysis. Accordingly, although we used a different method than that of the jury in this case; i.e., duty/risk analysis rather than strict liability, we reach the same conclusion that the Rivetts were without liability in this matter.
 

 CONCLUSION
 

 For the above and foregoing reasons, we affirm the judgment of the trial court. All costs associated with this appeal are assessed against plaintiff/appellant, David Wayne Everett.
 

 AFFIRMED.
 

 CARTER, C.J., concurs.
 

 [1]
 

 . In
 
 The Abolition of Strict Liability in Louisiana,
 
 43 Loy. L.Rev. at 231-233, the author considers the standard that has been created by amended Article 2321 as compared to the standard that existed prior to the adoption of strict liability in
 
 Holland,
 
 arguing that the negligence standard under Article 2321 post-1996 amendment is stricter:
 

 The application of article 2321 had generally been conceptually divided between liability for damages caused by domesticated and by undomesticated animals. Owners or keepers of wild animals had always been absolutely liable for all damages caused by their animals, regardless of the owner’s fault or negligence.... However, because the amended article no longer contains this
 
 *465
 
 distinguishing language, the responsibility of owners of all types of animals, except dogs, must now be determined under an identical liability standard.
 

 According to the article, an animal owner must be shown to have "known that his animal’s behavior would cause damage." This phrase raises two question[s]:(l) is responsibility based on an animal owner's knowledge of the animal’s past temperament, or on a reasonable expectation of the animal's future behavior; and (2) what is meant by "behavior?" A logical source for guidance in understanding the new standard would be for courts to interpret the article in accordance with the caselaw existing prior to
 
 Holland.
 
 Unfortunately, the caselaw preceding
 
 Holland,
 
 as the opinion noted, was inconsistent, and, in addition, may be insufficient in interpreting the new standard.
 

 Prior to
 
 Holland,
 
 most courts burdened the victim with proving both the existence of a dangerous propensity of the animal and the knowledge of such propensity by the owner. This approach is the most consistent with the Legislature’s apparent intent in amending article 2321, because it requires both an owner's knowledge and a dangerous propensity in the animal. However, the article essentially assumes an owner’s knowledge of the animal's behavior, and has added an additional requirement, similar to [Louisiana Civil Code] article 667, that an owner must either have known or should have known that the animal’s dangerous behavior
 
 would cause damage
 
 — a considerably higher burden.
 

 Nevertheless, this analysis still begs the question of what is meant by behavior, or even dangerous propensity. Behavior must be given a meaning equivalent to temperament, which can theoretically be based on either previous specific instances of dangerous conduct by an animal, or an animal’s inherent dangerousness. According to earlier caselaw, these two approaches were applied to domesticated and wild animals, respectively. Courts generally regarded domesticated animals as inherently safe; wild or undomesticated animals were considered inherently dangerous, and their owners were held absolutely liable for all injuries caused by the animal. However, domesticated animals could also be dangerous or vicious, and courts found an owner liable for any resultant damage only if the domesticated animal had a “previous history of a vicious temperament, or if the owner knew or had reason to know of a dangerous propensity in the animal.” Both analyses are still applicable, and are incorporated into the new standard.
 

 Under amended article 2321, an identical standard will apply to both domesticated and undomesticated animal owners, excluding dog owners. Because wild or undomesticated animals are generally considered inherently dangerous, an owner of such an animal will be presumed to have knowledge of the dangerous temperament or behavior of the animal. However, the owner must still be shown to have known that the animal’s behavior
 
 would cause
 
 the resultant damage. Similarly, an owner of a domesticated animal must be shown to have known that the animal had a previous history of a vicious temperament, or that the owner knew or should have known of the dangerous propensity in the animal. In addition, the owner of the domesticated animal must be shown to have known that the animal’s behavior
 
 would cause
 
 the resultant damages. Arguably, the new standard returns the law to the "first bite rule” existing prior to
 
 Holland.
 
 [Footnotes omitted.]