PETTIGREW, J.
| ¿The plaintiff, Zaine Kasem (Kasem), appeals a judgment that granted summary judgment in favor of the defendants, Joyce B. Williams, H.R. Williams Cattle Company (HRW), (defendants), and their insurer, State Farm and Fire Casualty Company, and dismissed Kasem’s claims against them for injuries she sustained allegedly when she was “run over” by a cow that had gotten loose from a herd co-owned by Williams and HRW. The cow escaped through a fence that ordinarily enclosed the herd, but had been damaged by a fallen tree. For the following reasons, we reverse and remand.
FACTUAL BACKGROUND
This incident occurred on March 24, 2012, in St. Gabriel, Louisiana. A few days prior, 3.77 inches of rain fell during a storm that occurred between approximately 8 a.m. on March 21, 2012 through 8 a.m. on March 22, 2012. Clay Espey, HRW’s representative in this litigation, and the individual who undertook all of the day-today responsibilities of the cattle business, including this particular herd, conducted an inspection of the pasture and the surrounding fences the day following the storm but before the incident, March 23, 2012, but did not observe any damage caused by the storm; specifically, he inspected the perimeters of the entire enclosure and saw no fallen trees or other damage to any of the fences.
By approximately 8:15 a.m. on March 24, 2012, a cow from the herd had gotten through a damaged fence, onto the public road and, ultimately, into Kasem’s front yard. Kasem heard noises coming from her yard, including people, trucks, horses, and four-wheelers, and went outside to see what was happening. She observed what she later alleged to be a “circus” in her front yard, consisting of numerous people and public officials involved in trying to corral and capture a cow, which was running erratically on the road, was visibly panicked, and exhibiting out-of-control, dangerous behavior. During the commotion, the cow entered Kasem’s front yard, rapidly approached and “ran over” Kasem, as she stood in her front yard, “knocking Kasem into a truck bed,” and injuring her.
*10 ¡ ■¡PROCEDURAL HISTORY
On February 28, 2013, Kasem filed a petition for damages, alleging that Williams and HRW are the co-owners, occupants, or possessors of the fence and enclosed pasture, as well as the herd from which the cow escaped. Kasem claimed that defendants breached the duty owed to her, pursuant to La. C.C. art. 2321, to restrain the cattle and prevent them from entering properties outside of the pasture and causing damage or injury. Among the acts constituting a breach of that duty, Kasem alleged defendants failed to construct and maintain a fence properly to restrain the cattle and prevent them from leaving the confined area; they failed to notify neighboring property owners that a cow had escaped the confined area; and, they negligently startled and provoked the cow “into frenzy” while attempting to retrieve it, causing the cow to charge and injure Kasem.
Kasem claimed that being “run over” by the cow resulted in severe injuries to her, including multiple myalgia, acute cervical-gia, vertigo, left great toe sprain, lumbago, bilateral right knee arthralgia, right nasal injury, right eye trauma, and soft tissue damages to her back and neck. Kasem claimed these injuries caused her physical and mental pain and suffering, and forced her to undergo extensive medical treatment. Kasem finally alleged that during treatment for her injuries, she was unable to work and ultimately had to resign from her job, which caused her also to suffer lost wages and loss of earning capacity.
Discovery ensued, and on June 23, 2015, defendants and State Farm filed a motion for summary judgment. In the supporting memorandum, defendants admit ownership of the cow, which they identified as “Miss Maggie,” and also admit that the cow escaped the enclosed pasture during the early morning hours of March 24, 2012. However, defendants deny that the cow ever struck or injured Kasem. Additionally, and in the alternative, they claim that Kasem lacks evidence to prove the defendants failed to exercise reasonable care. They claim the cow’s escape was due entirely to a fortuitous event over which they had no control and could not be held liable. Defendants further claim that several persons involved in the rescue efforts to corral the cow advised Kasem to go back inside of her house and out of harm’s way, but she refused to do so; instead |4she chose to stay outside and film the incident, all the while impeding the rescue by protesting their presence in her yard.
Defendants further asserted that HRW is a family business that has engaged in the raising and showing of Brahman cattle for many, many years. The company is more of a hobby for the family than a business operation; it does not have employees, does not make a profit, and generally “breaks even.” Following the death of the founding member, HRW has been run by his widow (defendant, Joyce Williams), his daughter (Kandice Willard, who is an officer of HRW), and his grandson, Clay Espey. Espey, as earlier stated, is the person in charge of all the day-to-day responsibilities of raising and breeding registered Brahman cattle, with the minor exception of letting the show calves out of their stalls in the morning, and the filing of taxes, two specific tasks that his mother and grandmother perform. At the time of the incident, HRW was leasing the nineteen (19) acres on which some of the cattle were kept, and in March 2012, there were approximately fifteen to twenty (15-20) Brahman cows in HRW’s herd.
Espey testified that prior to this incident, there had never been any claims filed against HRW, and no other incidents, involving cattle escapes, property damages, or injuries sustained thereby, had ever *11 occurred in the entire history of the business. Espey did admit that during the winter of 2011-2012, “a time or two” cows had escaped the pasture, following which HRW discovered its fence had been intentionally cut by persons illegally hunting on the property. However, despite those isolated incidents of escape, there were no property damages or injuries caused as a result of those incidents. HRW asserted that the claim filed by Kasem is the sole incident concerning HRW’s cattle operations that has occurred and resulted in litigation. Finally, defendants contended there are no genuine issues of material fact and, because Kasem would be unable to establish liability on their parts, they are entitled to summary judgment as a matter of law.
The district court held a hearing on the motion for summary judgment on September 1, 2015, and thereafter, on September 22, 2015, signed a judgment granting |Rthe summary judgment in favor of the defendants and dismissing Kasem’s claims against them. Kasem appeals that judgment.
APPLICABLE LAW
Louisiana Civil Code Article 2321 governs damage caused by animals and provides:
The owner of an animal is answerable for the damage caused by the animal. However, he is answerable for the damage only upon a showing that he knew or, in the exercise of reasonable care, should have known that his animal’s behavior would cause damage, that the damage could have been prevented by the exercise of reasonable care, and that he failed to exercise such reasonable care. Nonetheless, the owner of a dog is strictly liable for damages for injuries to persons or property caused by the dog and which the owner could have prevented and which did not result from the injured person’s provocation of the dog. Nothing in this Article shall preclude the court from the application of the doctrine of res ipsa loquitur in an-appropriate case.
The statute was amended by 1996 La. Acts, 1st Ex. Sess. No. 1, § 1, effective April 16, 1996, to abolish strict liability for owners of all animals (except dogs), and instead, liability is now subject to standards of ordinary negligence. The primary difference is that prior to the amendment, strict liability could be imposed without requiring the plaintiff to prove actual or constructive knowledge of" the animal’s dangerous propensities. See Pepper v. Triplet, 2003-0619 (La. 1/21/04), 864 So.2d 181, 194. In order for liability in negligence to attach under our traditional duty/risk analysis, a plaintiff must prove five separate elements: (1) the defendant had a duty to conform his or her conduct to a specific standard of care (the duty element); (2) the defendant failed to conform his or her conduct to the appropriate standard (the breach of duty element); (3) the defendant’s substandard conduct was a cause-in-fact of the plaintiffs injuries (the cause-in-fact element); (4) the defendant’s substandard conduct was a legal cause of the plaintiffs injuries (the scope of liability or scope, of protection element); and, (5) actual damages (the damages element). Everett v. State Farm Fire & Cas. Ins. Co., 2009-1699 (La.App. 1 Cir. 3/26/10), 37 So.3d 456, 463-64 (citations omitted).
Thus, under the amended statute, to find an owner liable for injury caused by his animal (other than a dog), applying a duty-risk analysis, a plaintiff must now show, among other factors, that the - animal’s owner knew or should have reasonably known of the danger posed by the animal, and that the owner could have taken reasonable | ¿measures to prevent in *12 jury, but failed to do so. Walker v. LeBlanc, 2012-0764 (La.App. 1 Cir. 12/21/12), 111 So.3d 1069, 1075, writ denied, 2013-0539 (La. 4/12/13), 110 So.3d 1080. In a case arising from an automobile accident that occurred when one of the vehicles struck one of several escaped cows that were on the roadway, not far from the pasture in which they were kept, the Louisiana Supreme Court discussed the duty element of a negligence case concerning injuries caused by escaped cattle. The court noted the cattle owner has a duty to take reasonable measures to prevent his animals from escaping their enclosure, and that this duty includes responsibility for the, condition of his fences. See Cornish v. Ford, Bacon & Davis Construction Corp., 304 So.2d 361, 365, writ refused, 305 So.2d 123 (La. 1974).[2]
SUMMARY JUDGMENT
After adequate discovery, a motion for summary judgment is properly granted if the pleadings, depositions, answers to interrogatories, and admissions, together with affidavits, if any, admitted for purposes of the motion, show that there is no genuine issue as to material fact and that the mover is entitled to judgment as a matter of law. La. Code Civ. P. art. 966(B)(2) & (C)(1) (prior to amendment by 2015 La. Acts, No. 422, effective January 1, 2016).[3] The summary judgment procedure is expressly favored in the law and is designed to secure the just, speedy, and inexpensive determination of non-domestic civil actions. See La. Code Civ. P. art. 966(A)(2).
The mover bears the burden of proving that he is entitled to summary judgment. However, if the mover will not bear the burden of proof at trial on the subject matter of the motion, he need only demonstrate the absence of factual support for one or more essential elements of his opponent’s claim, action, or defense. La. Code Civ. P. art. 966(C)(2) (prior to amendment by 2015 La. Acts, No. 422, effective January 1, 2016).[4] ]7If the moving party points out that there is an absence of factual support for one or more elements essential to the adverse party’s claim, action, or defense, then the nonmoving party must produce factual support sufficient to satisfy his evidentiary burden at trial. La. Code Civ. P. art, 966(C)(2) (prior to amendment by 2015 La. Acts, No. 422, effective January 1, 2016). If the nonmov-ing party fails to make this requisite showing, there is no genuine issue of material fact, and summary judgment should be granted. See La. Code Civ. P. art. 966(C)(2) (prior to amendment by 2015 La. Acts, No. 422, effective January 1, 2016). If, however, the mover fails in his burden to show an absence of factual support for one or more of the elements of the adverse party’s claim, the burden never shifts to the adverse party, and the mover is not entitled to summary judgment. LeBlanc v. Bouchereau Oil Co., Inc., 2008-2064, p. 4 (La.App. 1 Cir. 5/8/09), 15 So.3d 152, 155, writ denied, 2009-1624 (La. 10/16/09), 19 So.3d 481.
In ruling on a motion for summary judgment, the trial court’s role is not to evalu *13 ate the weight of the evidence or to determine the truth of the matter, but instead to determine whether there is a genuine issue of triable fact. Hines v. Garrett, 2004-0806, p. 1 (La. 6/25/04), 876 So.2d 764, 765 (per curiam). Factual inferences reasonably drawn from the evidence must be construed in favor of the party opposing the motion, and all doubt must be resolved in the opponent’s favor. Willis v. Medders, 2000-2507, p. 2 (La. 12/8/00), 775 So.2d 1049, 1050 (per curiam).
In Smith v. Our Lady of the Lake Hospital, Inc., 93-2512, p. 27 (La. 7/5/94), 639 So.2d 730, 751, the Louisiana Supreme Court set forth the following parameters for determining whether an issue is genuine or a fact is material.
A “genuine issue” is a “triable issue.” More precisely, “[a]n issue is genuine if reasonable persons could disagree. If on the state of the evidence, reasonable persons could reach only one conclusion, there is no need for a trial on that issue. Summary judgment is the means for disposing of such meretricious disputes.” In determining whether an issue is “genuine,” courts cannot consider the merits, make credibility determinations, evaluate testimony or weigh evidence. “Formal allegations without substance should be closely scrutinized to determine if they truly do reveal genuine issues of fact.”
|rA fact is “material” when its existence or nonexistence may be essential to plaintiffs cause of action under the applicable theory of recovery. “[F]acts are material if they potentially insure or preclude recovery, affect a litigant’s ultimate success, or determine the outcome of the legal dispute.” Simply put, a “material” fact is one that would matter on the trial on the merits. Any doubt as to a dispute regarding a material issue of fact must be resolved against granting the motion and in favor of a trial on the merits. [Citations omitted.]
 In determining whether summary judgment is appropriate, appellate courts review evidence de novo under the same criteria that govern thé trial court’s determination of whether summary judgment is appropriate. East Tangipahoa Development Company, LLC v. Bedico Junction, LLC, 2008-1262, p. 8 (La.App. 1 Cir. 12/23/08), 5 So.3d 238, 243, writ denied, 2009-0166 (La. 3/27/09), 5 So.3d 146. Because it is the applicable substantive law that determines materiality, whether a particular fact in dispute is material can be seen only in light of the substantive law applicable to this case. Pumphrey v. Harris, 2012-0405, p. 5 (La.App. 1 Cir. 11/2/12), 111 So.3d 86, 89.
EVIDENCE PRESENTED/ANALYSIS
Defendants and State Farm, the movers on the motion, would not bear the burden of proof at trial on the merits; therefore, in order to be entitled to summary judgment, they need only demonstrate the absence of factual support for one or more of the essential elements of Kasem’s claim of negligence under La. C.C. art. 2321. See La. C.C.P. art. 966(C)(2). If the defendants are successful in demonstrating such lack of factual support for plaintiffs cause of action, the burden shifts to the nonmoving party, Kasem, who must then produce factual support sufficient to- satisfy her evi-dentiary burden at trial. Id. We review the evidence de novo to make this determination.
Kasem’s burden at trial would be to show, pursuant to La. C.C. 2321, the requisite elements of a duty-risk analysis: that HRW owed a duty; that HRW breached that duty; (that HRW knew or reasonably should have known that the cow’s behavior could cause damage or injury; and could have taken reasonable measures to pre *14 vent the injury but failed to do so); that HRW’s negligence was the cause of her damages; and that she was injured. The duty owed by HRW, to use reasonable care in preventing the escape of their Uanimals to prevent injury to others, is established and not disputed by the parties. To support their motion for summary judgment, defendants presented the following evidence to establish Kasem would be unable to meet certain other requisite elements to prove her cause of action against them.
Breached Duty of Reasonable Care Re: Fences
Defendants and State Farm assert that Kasem will be unable to prove that HRW breached its duty to exercise reasonable care relative to the existence, upkeep, and maintenance of the fences surrounding the pasture to prevent the escape of its cattle. Defendants presented evidence through the deposition testimony of Espey that since the inception of its lease of the nineteen acres where the herd was kept, HRW maintained a barbed wire fence that effectively contained its herd of cattle for many years, with the exception of two related instances of illegal activity by a third party hunter who intentionally cut the fence and allowed some cows to escape. Espey further testified that even with those two related escape incidents, no damage resulted. He attested that in the entire history of the existence of the family business, no claims had even been filed against it.
With regard to maintaining the fence, Espey testified that on the afternoon of Friday, March 23, (the day before this incident occurred), he conducted a walkth-rough inspection along the perimeters of the fences to ensure that they were all intact and he found that they were. Espey stated that he checks the fences “regularly,” at least two times per week, usually on Wednesdays and one day of the weekend. He added that he purposefully conducted that particular inspection on Friday afternoon because he was going to be working out of town that Saturday, and wanted to inspect the fences before he left as he was due to inspect them that weekend. Espey testified that, as a rule, he does not conduct inspections immediately after a heavy rainfall, unless he has reason to believe the storm caused damage. Espey testified the inspection that Friday afternoon took him approximately 45 minutes to an hour, and that he found all fences intact and the herd was safely enclosed in the pasture. Espey further testified that he observed no broken or fallen tree branches or limbs on any of the fences, and that he observed no Imopenings or damage to any of the fences surrounding the herd of cattle. Espey testified that when he arrived back into town Saturday afternoon, after learning of the escaped cow incident, he inspected the pasture fences again (either Saturday afternoon or Sunday) and this time, noticed that a tree limb had fallen and damaged a fence. He also noted that a family friend had repaired the fence.
Defendants maintain that, since Espey observed a fallen tree limb on a damaged fence on Saturday that he testified had not been there on Friday, the evidence established that the tree limb fell after the storm and Espey’s inspection on March 23, 2012, and Kasem would be unable to prove an essential element of her claim that HRW breached its duty to reasonably maintain its herd’s enclosure to prevent an escape.
Kasem offered no evidence to controvert Espey’s testimony that he had used reasonable care in inspecting the fence both before and after the storm. Instead, she relied on argument that his testimony was wrong: that the tree limb that damaged the fence allowing the cow to escape fell *15 during the storm and Espey negligently failed to discover it during the Friday afternoon inspection. Defendant’s evidence to the contrary, together with Kasem’s absence of contradictory evidence, establishes Kasem has no factual basis to support this essential element of her claim such that she would be able to prevail on the issue at a trial on the merits. Accordingly, summary judgment is appropriate as to this element of Kasem’s claim.
Judicial Confession by Defendants Re: Inspection of Fences
Kasem also argued that the defendants judicially confessed that the tree limb fell during the storm and that confession precludes any evidence to the contrary. Initially, there was some dispute regarding the exact dates of the storm and when the tree limb fell. In their original answer to the petition and, again, in answer to interrogatories, defendants asserted that the tree limb fell during a thunderstorm that occurred on March 23 through March 2k- In their original memorandum in support of the motion for summary judgment, the defendants submitted a list of undisputed material facts that included a statement that the rainstorm occurred on the night of March 23 and lasted through the early morning hours of March 2Jh the date this incident occurred. ^Additionally, defendants asserted as an undisputed fact that the tree limb that damaged the fence fell during that rainstorm.
However, once Kasem produced documentation from the National ■ Weather Service (U.S. Department of Commerce, National Centers for Environmental Information) that established the storm occurred between 8 a.m. Wednesday, March 21 and 8 a.m. Thursday, March 22, defendants did not dispute such evidence and admitted mistaking the dates of the storm. Defendants filed a supplemental memorandum in support of their motion for summary judgment, as well as an amended list of undisputed material facts, in which they asserted the new, corrected dates for the storm. Additionally, where defendants originally asserted the tree limb fell during the storm, they now asserted the tree limb fell following the rainstorm, based on their newly acquired knowledge of the dates of the storm vis a vis the date of Espey’s inspections of the fence. Defendants continued to rely on Espey’s uncontroverted testimony regarding his finding no evidence of damage on the Friday afternoon inspection, yet, observing a fallen tree limb damaging the fence on Saturday or Sunday afternoon, to establish when the tree limb actually fell.
A judicial confession is defined in La. C.C. art. 1853 as a declaration made by a party in a judicial proceeding, which confession constitutes full proof against the party who made it. The article further provides that a judicial confession is indivisible and may be revoked only on the ground of an error of fact. C.T. Traina, Inc. v. Sunshine Plaza, Inc., 2003-1003 (La. 12/3/03), 861 So.2d 156, 159. In Tucker v. St. Tammany Parish School Board, 2003-2401 (La.App. 1 Cir. 9/17/04), 888 So.2d 235, 237, the plaintiff in a workers’ compensation suit attestéd that her annual wage was a certain amount. However, later, she became aware of some calculation discrepancies that resulted in an amount of annual wages different from that to which she originally attested. Upon discovering her error, the plaintiff sent correspondence to the court as well as amended her pleadings to reflect the “correct” amount of her annual wages. The court rejected the defendant’s claim that the amount originally provided was a judicial confession, finding instead that the plaintiff sufficiently showed that her initial statement | igwas made in error, and the district court *16 did not err in allowing the amendment and revoking the earlier admission. Id. at 238.
Kasem claims that defendants’ attestation in the original answer and in their original list of undisputed facts constitutes a judicial confession by which they are bound. Defendants maintain that the alleged judicial confession, that the tree fell on the fence during the storm, was based on their mistaken understanding of when the storm occurred. According to the defendants, the attestations as to when the tree fell were based on the inspections conducted by Espey, and not according to the date of the storm. Once the error was revealed by the climatology records introduced into evidence establishing the date of the storm was actually earlier than Es-pey believed it to be, the defendants recognized that error led them to inadvertently, mistakenly attest that the tree limb fell during the storm. The record further reveals that the defendants promptly filed a supplemental memorandum in support of the motion for summary judgment, as well as an amended list of undisputed facts, correcting the error by stating that based on the official date of the storm, the tree fell following the storm instead of during the storm, as mistakenly asserted in their earlier pleadings. In those amending pleadings, the defendants detailed the error, how the error occurred and how it was revealed, as well as explaining the logic behind the mistake and their attestations.
We have reviewed the entire record and the applicable jurisprudence and find, as the court did in Tucker, supra, that defendants have sufficiently proven that the assertion of the date the tree fell was based on the mistaken belief as -to when the storm took place, and that once they were aware of the error, they promptly amended their assertions to coincide with the corrected dates. We find no merit to Kasem’s argument that the defendants are bound by any alleged judicial confession that the tree fell during the storm. Further, our review of the record confirms that the testimony of Espey regarding his inspections of the fence both before and after the incident established that the tree fell sometime between the inspection on Friday and the inspection on Saturday or Sunday afternoon following, and that- this testimony was uncontrovert-ed. Moreover, it sufficiently established that the defendants exercised reasonable care in providing and | ^maintaining an enclosure to prevent the herd from escaping, and also established that Kasem would be unable to prove that the defendants breached the duty owed to exercise reasonable care to prevent escape and damage by any of its cows.
Knowledge of Dangerous Propensities of Animal and Breach of Duty to Exercise Reasonable Care in Light of that Knowledge?
In order to establish the defendants’ liability for their alleged negligence in their retrieval efforts, which Kasem alleged startled the cow and provoked it “into frenzy,” Kasem, who bears the burden of proof at trial, must be able to prove that the defendants “knew, or in the exercise of reasonable care, should - have known” of the cow’s propensity to behave erratically and cause damage, that the damages (or injuries) could have been prevented by the exercise of reasonable care, and that defendants failed to exercise such reasonable care. See La. C.C. art. 2321. The defendant movers will not bear the burden of proof at trial, so pursuant to summary judgment law, they need only point out the absence of factual support for this element essential to Kasem’s cause of action.
Defendants maintain they have shown that their efforts in reclaiming Miss Maggie were reasonable, and therefore, the *17 evidence reflects an absence of factual support for this essential element of Kasem’s cause of action against them. When the burden then shifted to Kasem, defendants maintain Kasem failed to produce sufficient evidence reflecting that she would be able to prove her burden at a trial on the merits. First, defendants question the evi-dentiary proof relied on by Kasem, namely, the testimony of Espey and Ms. Willard regarding their knowledge, and the behavior propensities of cows in general, and more specifically, that Miss Maggie would exhibit dangerous behavioral tendencies or propensities while escaped. Defendants claim that since Miss Maggie, prior to this incident, had never escaped, that testimony, rather than being probative, is mere speculation. Defendants also argue that Espey was not present during the incident, so his opinion testimony should not be considered in assessing the actions of HRW in reclaiming the cow. Particularly, defendants take issue with E spey’s testimony that his preferred and first attempt method for reclaiming an escaped cow is to lure the cow back to pasture with a bucket of feed. Defendants argue that evidence can have no bearing or probative | ueffect concerning this particular incident, since there is no evidence that this action would have been successful in reclaiming Miss Maggie. Additionally, they argue that the simple fact that defendants did not first employ the method preferred by Espey on the day of the incident does not establish negligence on their part. They rely, in part, on evidence revealing that there is no “established” correct procedure in the industry for reclaiming an escaped cow, therefore, the methods employed must be considered on a case by case basis, taking into consideration the facts and circumstances surrounding each incident. They further urge that their attempt to cut a hole in the fence, instead of luring the cow with a bucket of feed, was not negligent simply because Espey would have done it differently, especially in the absence of any evidence that E spey’s preferred method would have been successful. Moreover, they maintain that it was reasonable to cut a hole in the fence in an attempt to direct the cow back into the pasture, particularly in light of the fact that the rest of the herd was near the hole that was cut and that Miss Maggie, pursuant to general tendencies, would probably attempt to rejoin the herd. (We note defendants make no mention that this evidence could also establish a basis for finding their actions negligent, in light of the fact that, according to that same testimonial evidence, they knew that cutting the fence so near to where the herd was gathered, would cause the herd to move away from that commotion, thus, further separating the herd from Miss Maggie and increasing the distress of the cow on the road nearby.) Defendants rely on the foregoing evidence to establish a factual basis for finding that they acted reasonably under the circumstances existing at the time, and that Kasem would not be able to prove that their actions were unreasonable. Our da novo review of the evidence presented reveals otherwise; as explained below, there remain genuine issues of material fact concerning the reasonableness of the defendants’ recovery efforts sufficient to preclude summary judgment.
Kasem responded to defendants’ showing with evidence that the atmosphere created by the defendants’ response and attempts to reclaim the escaped cow was chaotic and like a “circus,” including the commotion and noise created by a large crowd of people, four-wheelers, and dogs that unnecessarily provoked, agitated, and further | ^distressed the already nervous cow. The evidence presented reveals there was a large crowd present, including police and fire department personnel, and pass *18 ers-by and neighbors. However, it remains in dispute how much of that crowd and commotion was attributable to action taken by the defendants. Ms. Willard admitted that she telephoned three people to enlist help when she became aware that the cow was being difficult to corral, and that she asked friends and neighbors familiar with cattle operations to come with dogs, a dart gun (that was never obtained), and whatever assistance they could provide.
Finally, both Espey and Ms. Willard testified that they were both familiar with the general propensity of all cows to become agitated and nervous when separated from their herd. They both also admitted to knowing that the escaped cow, Miss Maggie, was heavy-bred (pregnant) at the time, a factor which would certainly serve to increase her irritability and propensity to behave erratically under the stress of the circumstances of being separated from the herd.
At the outset, our review reveals there are several undisputed facts concerning the defendants’ response to the escaped cow and the methods employed by them in attempting to corral and capture it without causing any damage. First, it is undisputed that Espey, the person ordinarily responsible for the herd and for responding to, and coordinating, recovery efforts necessary to recovering an escaped cow, was working out of town and was not present in person throughout the entire incident. His only involvement while the incident was occurring was several telephone calls he had with his mother, Ms. Willard. Ms. Willard, as the daughter of the founding owner of HRW, was raised among, and had been involved in, the cattle business, specifically, the raising of registered Brahman cattle, for many decades, or “as long as I can remember.” Accordingly, she was very familiar with all general operations of raising registered Brahman cattle, including the characteristics and behavioral patterns of those animals. Ms. Willard was an officer of HRW, and assisted her son, as needed, with the operations of the family business. Giving examples, she stated that when a fence went down, she would help Espey get it back up, and she also assisted in “working] the cattle to do the 11 ¿vaccinations.” However, she testified that Espey was the person generally responsible for maintaining the pasture area and the herd.
It is also undisputed that the police made the initial call at approximately 8:15 the morning of March 24, notifying the defendants that one of their cattle was escaped and on the public road. The call was made to Joyce Williams, the original owner’s widow and Espe/s grandmother. Ms. Williams immediately notified her daughter and Espey’s mother, Ms. Willard, that a cow had escaped the enclosure and was on the public road. Ms. Willard immediately got in her vehicle and drove to HRW’s pasture, where she observed one cow on the roadway. The rest of the herd, although enclosed within the fence, was close to the road.
Ms. Willard called Espey’s roommate, Dustin Theriot, to enlist his assistance. She stated she was going to attempt to get the cow back into the enclosure, but she could not find an opening in the fence near where the herd was located and where the cow was on the road. Theriot arrived within minutes, and together they cut a hole in the fence, near the road, in attempts to herd the cow back through into the pasture. This maneuver was unsuccessful, as it apparently caused the herd to move away from the fence toward the back of the pasture, which in turn, caused the cow, now further separated from the herd, to start running up and down the road.
At that point in time, Ms. Willard’s mother, Ms. Williams, had arrived on the *19 scene, and Ms. Willard also placed a call for help to a friend whom she knew was familiar with the cattle business. The friend’s husband and son arrived shortly thereafter to assist Ms. Willard. According to Ms. Willard, she could tell that the cow was getting increasingly nervous. As they were not having any luck corralling the cow, Ms. Willard called “numerous people to try and come.” (Ms. Willard’s later testimony clarified that she personally called three people, but did not call the other people who showed up to help.)
The local police had already been on the scene, directing traffic; fire department personnel were on the scene; and, various other people familiar with cattle and cattle operations, arrived on the scene, some on four-wheelers, in attempts to help. Ms. Willard testified she did not personally call and ask assistance from all of the people who showed |17up. She believed some people, either by “word of mouth” or from just passing by, ended up on the scene attempting to help corral the cow.
Ms. Willard testified that she was aware that cattle, in general, could get excited and/or skittish or frightful over a number of different things. For example, when a cow gets separated from the herd, it may get nervous and attempt to get back with the other cattle; a cow separated from her calf would also attempt to get back, to the calf; and a pregnant (“heavy-bred”) cow, like Miss Maggie was at the time of the incident, would, be even more prone to nervousness and getting temperamental when stressed or agitated.
The deposition testimony of Espey with regard to his familiarity with the behavior of Brahman cattle was also offered into evidence. In addition to being the person in primary charge of HRW’s cattle operations, Espey is also a veterinarian and has worked with horses and cattle his entire life. In addition to running the family business of raising Brahman cattle, he also worked with many breeds of cattle as a result of also having a large animal veterinary hospital practice. When questioned about the general temperament and demeanor of cattle, Espey stated that all of HRW’s Brahman cattle are different. In general, they are brought to the barn at approximately six to eight months of age and are gentle enough that they will follow a bucket of feed into the pasture. He stated the cattle stay “pretty gentle, for the most part,” as long as they remain together with the herd. Espey testified he was specifically familiar with Miss Maggie; she was one of the cows HRW used for breeding (a show cow) and that she was a relatively gentle cow. However, he did acknowledge that she was pregnant at the time of her escape, which condition may or may not exacerbate the ordinary level of stress and nervousness a cow may be under.
In general, Espey testified that any cow that becomes separated from the herd is going to exhibit out of the ordinary behavior, as being away from the herd makes a cow prone to being easily startled and panicked. According to Espey, a cow separated from the herd would be distressed and attempting to get back with the herd. Espey testified that HRW, being a small, family-owned business, did not have any set procedures or policies in place for corralling and capturing cows escaped from the herd. Rather, he | isgenerally attempts to do so by himself, according to the circumstances presented. He stated that he would first attempt to have the cow follow a bucket of feed back into the pasture, and that generally, he can accomplish this alone; however if the cow is upset, nervous, or will not follow the feed bucket, it may take one or two other people to “crowd” the cow and get it to move in a desired direction. In Espey’s opinion, in *20 the worst case scenario with a nervous cow running around and not responding, he would attempt to rope the cow. He stated that was the preferable method because it takes only two people to accomplish.
Espey opined that having eleven to twelve or more people (the approximate number of people present at the time of the incident) attempting to corral a cow would cause great stress to an already nervous animal. Espey acknowledged that if roping the cow is not attempted, or if the cow is so panicked and out of control that roping cannot be attempted, it may take many more people to accomplish the capture. However, Espey noted that because a greater number of people would be necessary, and the crowd would only serve to exacerbate the cow’s distress, he considered this an option of last resort. Moreover, in the event more people become necessary to reclaim the cow, every person involved in the effort must use much slower, calculated movements in order to prevent or minimize provoking or startling the already distressed animal.
We find the evidence presented establishes at least a factual basis for Kasem’s claim that the defendants acted unreasonably in light of this knowledge, sufficient to render summary judgment improper. There remain genuine issues of material fact regarding the reasonableness of defendants’ actions in light of the possibility of other options that may have been employed to recapture the cow that would have been less stressful for the cow, and therefore, prevent any resulting damage. Additionally, despite defendants’ admission that they had knowledge regarding the potential for cows to become skittish and unpredictable when separated from the herd, there are genuine issues of material fact regarding the reasonableness of their actions in light of this knowledge (such as the action of cutting a hole in the fence nearest the escaped cow, when the herd, which was also located near the fence may become startled by the cutting 11flof the fence, resulting in it moving further away and, possibly, provoking the cow’s increasingly erratic behavior). We find Kasem met her burden in opposing the summary judgment, showing both, the existence of a factual basis to support her claims, as well as revealing the existence of genuine issues of material fact that repiain and must be resolved based on all of the evidence presented to a trier of fact in a trial on the merits. Accordingly, summary judgment is not warranted.
Fortuitous Event
Because we have found reversible error in the sustaining of the motion for summary judgment on the basis of a sufficient showing of factual support for an essential element of Kasem’s claim—that defendants failed to exercise reasonable care in the reclaiming of the cow—we must address the effect, if any, of defendants’ contention that the entire incident, including Kasem’s injuries, resulted from a fortuitous event over which the defendants had no control. While we agree that a severe thunderstorm that causes high winds, fallen trees, and other damages may be a fortuitous incident (“act of God”) over which the defendants have no control, the issue of the reasonableness of the defendants’ actions in reclaiming the cow are unaffected by the preclusive effect that a fortuitous event has on the imposition of liability. Kasem’s claim of negligence focuses on the defendants’ actions after the fortuitous event over which they did have control; a claim separate, apart, and wholly unrelated to the damage directly caused by the fortuitous event, i.e., a fallen tree that damaged the fence and rendered the enclosure vulnerable to an escape. Thus, *21 even though, in part, the incident was caused by a fortuitous event, the portion of Kasem’s claim of liability regarding actions outside of the scope of the effects of the fortuitous event is nonetheless subject to an imposition of liability on the basis of negligence and damages beyond the scope of the effects of the said fortuitous event. Accordingly, as to this element of Kasem’s claim, the defendants cannot escape liability on that basis.[5]
^CONCLUSION
Our de novo review reveals the existence of genuine issues of material fact, precluding summary judgment in this matter. Accordingly, we reverse the September 22, judgment that sustained the motion for summary judgment in favor of H.R. Williams Cattle Company, Joyce B. Williams, and State Farm Fire and Casualty Company and dismissed Kasem’s claims. Kasem’s claims are reinstated, and the matter is remanded back to the district court for further proceedings consistent herewith. All appeal costs are assessed to the defendants.
REVERSED AND REMANDED.
McDonald dissents with reasons.
Holdridge, J., dissents for the reasons assigned by Judge McDonald.

. Although Cornish is a pre-amendment case, the discussion of the duty owed by owners of cattle is nonetheless relevant and instructive when applying the amended version of La. C.C. art. 2321. We also note that despite the strict liability nature of the pre-amendment statute, the jurisprudence reflects that many appellate courts refused to find an animal owner strictly liable under article 2321 unless the damage suffered by the plaintiff was caused by an animal that created an unreasonable risk of harm. See Boyer v. Seal, 553 So.2d 827, 834 (La. 1989).

. Now, see La. Code Civ. P. art. 966(A)(3).

. Now, see La. Code Civ. P. art. 966(D)(1),

. We also note the evidence presented also reveals the existence of genuine issues of material fact of whether Kasem was actually injured by contact with the escaped cow. According to Kasem, she was thrown by the impact with the cow into the bed of a pick-up truck next to where she had been standing. Contrarily, there was testimony from some witnesses who stated they observed Kasem hastily jump into the truck bed to avoid contact with the cow. Because the district court rendered summary judgment on other bases, there was no discussion of this causation element essential to the plaintiff’s cause of action. However, since we have found reversible error and reverse the summary judgment, we note the record also reflects the existence of these disputed facts, also rendering summary judgment improper.