STATE OF LOUISIANA

COURT OF APPEAL

FIRST CIRCUIT

NO. 2021 CA 0589

SABRINA SCOTT

VERSUS

JENNIFER ADAMS AND KENNETH ADAMS, III

Judgment Rendered: **FEB 1 7 2022**

\* \* \* \* \*

On Appeal from the
22nd Judicial District Court
In and for the Parish of St. Tammany
State of Louisiana
Trial Court No. 2017-14333

Honorable August J. Hand, Judge Presiding

\* \* \* \* \*

Galen M. Hair
Trent Moss
Metairie, LA
and
Kristin M. Lausten
New Orleans, LA

Attorneys for Plaintiff-Appellant
Sabrina Scott

Shannon Howard-Eldridge
Lauren A. Williams
Mandeville, LA
and
John M. Robin
Catherine M. Robin
Covington, LA

Attorneys for Defendants-Appellees,
Jennifer Adams and Kenneth Adams, III

\* \* \* \* \*

BEFORE: WHIPPLE, C.J., PENZATO, AND HESTER, JJ.

**HESTER, J.**

This appeal is from the trial court's grant of summary judgment in favor of the lessor/owners of a leased residence dismissing the claims of the lessee for bodily injury and property damages allegedly caused by exposure to mold in the residence. For the following reasons, we affirm.

## FACTS AND PROCEDURAL HISTORY

In 2007, Kenneth Adams, III as the residential contactor for his construction company, built a home at 905 Agnes Street in Mandeville, Louisiana. After the home was complete, he and his wife, Mrs. Jennifer Adams lived there with their family until 2015. After they moved out, on November 27, 2015, Mr. Adams entered into a "Standard Residential Lease Agreement" with Ms. Sabrina Scott for the lease of the Agnes Street home from December 1, 2015 to December 1, 2016 and continuing month to month thereafter.

Around July 8, 2017, approximately seventeen months after Ms. Scott moved into the home, she discovered that the electrical outlets on the backsplash and cooktop in her kitchen were not working. Ms. Scott looked in the cabinet under the cooktop and noticed what appeared to be mold growing inside the cabinet. In the afternoon on Saturday, July 8, 2017, she texted Mr. Adams to let him know that the electricity to the cooktop went out and when she looked in the cabinet under the cooktop she discovered "a major mold problem." In the text, she also told Mr. Adams that she was highly allergic to mold. Mr. Adams responded that he would be there Monday. On Monday afternoon, Mr. Adams came to the home and cleaned the surface of the cabinet. He returned to the home the next day to work on the cooktop and continue cleaning.

On July 17, 2017, Ms. Scott again texted Mr. Adams, "I don't think this mold is all gone. It needs to be fully remediated...I can only be there briefly before feeling sick." Mr. Adams returned to the home to attempt to test for mold. At some point,

2

communication between Ms. Scott and Mr. Adams deteriorated, and the Adamses were unable to access the home. On July 27, 2017, Ms. Scott hired Mr. Brent Driskill, a licensed mold remediation contractor, to perform an environmental assessment of the Agnes Street home. While Mr. Driskill was inspecting the home, Mrs. Adams came to the home. The next day, Mr. Adams initiated an eviction proceeding against Ms. Scott, and on August 2, 2017, an order was signed mandating Ms. Scott to vacate the premises.

Ms. Scott filed suit on September 19, 2017, against Mr. and Mrs. Adams for wrongful eviction and for damages caused by exposure to mold in the Agnes Street home. In her petition, Ms. Scott stated the action or inaction of the Adamses caused the mold, and the mold caused her to suffer substantial negative health effects and damages to her personal property. The Adamses answered Ms. Scott's suit and filed a reconventional demand alleging that Ms. Scott violated the terms of the lease and caused damage to their property. On July 23, 2018, the Adamses filed a motion for summary judgment, which was denied except for Ms. Scott's claims related to the wrongful eviction.

Thereafter, the parties engaged in extensive discovery involving multiple experts and depositions. On May 1, 2020, the Adamses filed a second motion for summary judgment on two grounds. First, the Adamses contended that Ms. Scott's suit should be dismissed because the terms of the lease agreement contain waivers of liability in favor of them as the lessors whereby they are not responsible for the personal injury and property damages Ms. Scott pursued in her petition. Second, the Adamses contended that Ms. Scott cannot show general or specific causation required for toxic mold cases because she does not have medical evidence to show mold exposure or that mold exposure caused her to suffer any injury or illness.

3

Ms. Scott also filed a motion for summary judgment regarding the Adamses' reconventional demand for property damages and a partial motion for summary judgment regarding damages to her property and medical damages.

Ms. Scott responded to the Adamses' motion for summary judgment, contending that the waiver in the lease was ineffective because under La. R.S. 9:3221 the Adamses knew or should have known of the defect that caused the mold and further that the Adamses failed to remedy the mold within a reasonable time after receiving notice of the defect. Further, Ms. Scott contends that she provided ample medical evidence to prove that she was exposed to mold and the exposure caused her to suffer health problems.

The Adamses' motion for summary judgment and Ms. Scott's motion for summary judgment and partial motion for summary judgment came before the court for a hearing on July 8, 2020. After argument, the trial court in oral reasons determined that the waiver in the lease agreement applied whereby the Adamses are exempt from liability for Ms. Scott's injury caused by mold in the home. Therefore, the trial court granted summary judgment in favor of the Adamses and pointed out that most of the remaining issues were moot. The trial court also granted summary judgment in favor of Ms. Scott regarding the Adamses' reconventional demand for property damages.

On July 30, 2020, the trial court signed a judgment in conformance with its oral reasons granting the Adamses' motion for summary judgment and dismissing Ms. Scott's suit against them with prejudice; denying Ms. Scott's motion for summary judgment relating to her claims for contents damages and injuries; and granting Ms. Scott's motion for summary judgment related to the Adamses' reconventional demand for property damages. It is from this judgment that Ms. Scott appeals, assigning error only to the motion for summary judgment granted in favor of the Adamses. Ms. Scott contends that the trial court erred in upholding the waiver

4

clause in the lease agreement where the Adamses, as the builders of the home, knew or should have known of defects in the home; where the Adamses failed to remedy the defects causing the formation of mold; and where the Adamses' negligence led to substantial physical injuries to Ms. Scott and damage to her personal property.

## LAW AND ANALYSIS

A motion for summary judgment is a procedural device used to avoid a full-scale trial when there is no genuine issue of material fact. **Jones v. Anderson**, 2016-1361 (La. App. 1st Cir. 6/29/17), 224 So.3d 413, 417. After an opportunity for adequate discovery, a motion for summary judgment shall be granted if the motion, memorandum, and supporting documents show there is no genuine issue as to material fact and that the mover is entitled to judgment as a matter of law. La. Code Civ. P. art. 966(A)(3). A "genuine" issue is a triable issue, which means that an issue is genuine if reasonable persons could disagree; if on the state of the evidence, reasonable persons could reach only one conclusion, there is no need for a trial on that issue. A fact is "material" when its existence or nonexistence may be essential to plaintiff's cause of action under the applicable theory of recovery. **Kasem v. State Farm Fire & Cas. Co.**, 2016-0217 (La. App. 1st Cir. 2/10/17), 212 So.3d 6, 13. The only documents that may be filed in support of or in opposition to the motion are pleadings, memoranda, affidavits, depositions, answers to interrogatories, certified medical records, written stipulations, and admissions. La. Code Civ. P. art. 966(A)(4).

The burden of proof rests on the mover. Nevertheless, if the mover will not bear the burden of proof at trial on the issue that is before the court on the motion for summary judgment, the mover's burden on the motion does not require him to negate all essential elements of the adverse party's claim, action, or defense, but rather to point out to the court the absence of factual support for one or more elements essential to the adverse party's claim, action, or defense. The burden is

then on the adverse party to produce factual support sufficient to establish the existence of a genuine issue of material fact or that the mover is not entitled to judgment as a matter of law. La. Code Civ. P. art. 966(D)(1).

Appellate courts review evidence *de novo* under the same criteria that govern the trial court's determination of whether summary judgment is appropriate. **Crosstex Energy Services, LP v. Texas Brine Company, LLC**, 2017-0895 (La. App. 1st Cir. 12/21/17), 240 So.3d 932, 936, writ denied, 2018-0145 (La. 3/23/18), 238 So.3d 963. Thus, appellate courts ask the same questions: whether there is any genuine issue of material fact and whether the mover is entitled to judgment as a matter of law. **Crosstex Energy Services, LP**, 240 So.3d at 936. Because it is the applicable substantive law that determines materiality, whether a particular issue in dispute is material can be seen only in light of the substantive law applicable to the case. **Jones**, 224 So.3d at 417.

*The Lease Agreement*

Under Louisiana law, the owner/lessor of a building is generally liable for the condition of the leased premises. La. Civ. Code art. 2696. However, the Louisiana legislature enacted an exception to this rule, which enables the lessee to assume responsibility for the condition of the premises in the lease contract. See La. R.S. 9:3221; see also **Stuckey v. Riverstone Residential SC, LP**, 2008-1770 (La. App. 1st Cir. 8/5/09), 21 So.3d 970, 974, writ denied, 2009-2328 (La. 1/8/10), 24 So.3d 873. Louisiana Revised Statute 9:3221 provides, "the owner of premises leased under a contract whereby the lessee assumes responsibility for their condition is not liable for injury caused by any defect therein to the lessee or anyone on the premises who derives his right to be thereon from the lessee, unless the owner knew or should have known of the defect or had received notice thereof and failed to remedy it within a reasonable time." Accordingly, La. R.S. 9:3221 establishes three factors by which a lessee who has assumed responsibility for the condition of the leased

6

premises may nevertheless assert liability for injury on the owner of the premises: if the owner (1) knew of the defect that caused the injury, (2) should have known of the defect that caused the injury, or (3) received notice of the defect and failed to remedy it within a reasonable time. **Lamb v. Ashford Place Apartments, L.L.C.,** 914 F.3d 940, 945 (5th Cir. 2019).

In their motion for summary judgment, the Adamses contend that they are not liable for the injuries to Ms. Scott caused by alleged defects in the premises because Ms. Scott assumed responsibility for the leased premises and there is no evidence that the Adamses "knew or should have known of the defect or had received notice thereof and failed to remedy it within a reasonable time." The Adamses filed several documents in support of their position including, the deposition of Ms. Scott, the deposition of Mr. Adams, the affidavit of Mr. Adams, and the affidavit of Mrs. Adams.

Attached to Mr. Adams's affidavit is the lease agreement signed by Ms. Scott and Mr. Adams, which provides the following relevant provisions:

> **NON-LIABILITY OF LANDLORD**: Tenant understands and agrees that Landlord and Landlord's agents shall not be liable for injury or damage to person or property of Tenant, his family, guests, employees or invitees, occurring in, on or about the leased premises, or occurring anywhere in or on the apartment building or area in which the leased premises are located, or in or upon the grounds in which the apartment building or house is located, or in any other building or structure on said grounds, however caused or arising except by the direct negligence of Landlord, or Landlord's agents or employees, and agrees to defend, indemnify and hold Landlord and Landlord's agents harmless from any and all claims, suits or damages resulting therefrom.
>
> **LEAD-BASED PAINT, ASBESTOS, RADON, MOLD**: Tenant is aware that the premises may contain lead-based paint, asbestos, mold or other toxins which may cause serious injury or death if consumed or ingested into the human body, and Tenant acknowledges that the "Protect Your Family from Lead in Your Home" pamphlet has been called to their attention with respect to notice and information of lead based paint. Having knowledge of these facts, Tenant agrees to maintain the premises in a reasonably safe condition, to report to Landlord any condition which may lead to damage or injury because of lead, asbestos, or other toxins, and Tenant further agrees to assume the use and occupancy of the herein leased premises at his own risk and hereby releases Landlord, his agents and/or representatives from any

7

claims relating to or sustained as a consequence thereof, and further agrees to hold harmless, defend and indemnify Landlord, his agents and/or representatives from any claims made by Tenant, residents of his household or others using the premises with the consent and permission of Tenant.

In the lease agreement, Ms. Scott agreed that she found "the Premises in acceptable condition" and that the landlord "shall not be liable for injury or damages to the person or property of Tenant...occurring in, on or about the leased premises." Specific to mold, Ms. Scott agreed "to assume the use and occupancy of the ... leased premises at [her] own risk and hereby releases Landlord, his agents and/or representatives from any claims relating to or sustained as a consequence thereof."

In his deposition and affidavit, Mr. Adams pointed out that the text he received from Ms. Scott on July 8, 2017, was the first time Ms. Scott mentioned mold in the Agnes Street home, and the only area she complained about was the cabinet under the cooktop. He attested that he immediately advised Ms. Scott that he would be there on July 10, 2017, to inspect the premises, and that he went to the home, on that day, and inspected and cleaned the area where Ms. Scott said there was mold. Mr. Adams said that the spots in the cabinet wiped off pretty easily.

Mr. Adams said Ms. Scott texted him again on July 17, 2017, advising him that she did not think the mold was gone, and he responded that he would be there on July 19, 2017, to test the home. Mr. Adams testified that Ms. Scott did not provide a time for him to test the home on July 19, 2017, and he performed the testing on July 20, 2017. According to Mr. Adams, he filed a Petition for Eviction on July 27, 2017, and an order of eviction was issued on August 2, 2017. He said that that he instituted the eviction because Ms. Scott was not letting him or his wife into the home.

Mr. Adams stated that during the years he and his family lived in the Agnes Street home he never experienced any issues with mold. According to Mr. Adams, he went to the home maybe a dozen times when Ms. Scott lived there, and prior to

8

July 10, 2017, the last time he went to the Agnes Street home was "maybe six months before" and he had no recollection of the last time he looked in the cabinet under the cooktop.

In her deposition, Mrs. Adams said that January 2017 was the first contact she had with Ms. Scott when she went to the home for a termite inspection, and that was the last time she was in the home until July 2017. She also stated that she and Mr. Adams did not have mold issues when they lived in the home. Mrs. Adams said she attempted to communicate with Ms. Scott so that she could further clean the home, but Ms. Scott said she was unavailable and would not allow Mrs. Adams access to the home.

During her deposition, Ms. Scott said that she discovered the mold when she looked in the cabinet under the cooktop because the cooktop would not light. Ms. Scott said she was experiencing symptoms three to four months before the July 8, 2017 text, but agreed that the mold she found in the cabinet under on July 8, 2017, was the first mold she found in the home. Ms. Scott corroborated Mr. Adams's statement that the July 8, 2017 text she sent to Mr. Adams was the first time she mentioned mold to him and that Mr. Adams came to the home two days later to clean the surface with a mold cleaner. She also agreed that Mr. Adams returned to the home to clean and attempted to test for mold.

The evidence submitted by the Adamses in support of their motion for summary judgment demonstrated that they did not have issues with mold when they lived in the Agnes Street home; Ms. Scott assumed responsibility for the condition of the home in the lease agreement; the Adamses were rarely in the home while Ms. Scott lived there; Ms. Scott's July 8, 2017 text message sent over seventeen months after moving in was the first time Ms. Scott mentioned mold to the Adamses; the Adamses promptly responded to her complaints by cleaning the area; and promptly responded again until they were not given access to the home. We find the evidence

submitted by the Adamses pointed out to the court the absence of factual support for an essential element to Ms. Scott's claim that the waiver in the lease agreement was ineffective. Specifically, the Adamses pointed out that they did not have actual or constructive knowledge about the mold or any defect that would cause mold and responded within a reasonable time when notified about the mold. Accordingly, the burden shifted to Ms. Scott to produce factual support sufficient to establish the existence of a genuine issue of material fact as to whether the Adamses knew or should have known about the mold or failed to remedy the defect within a reasonable time.

In her first assignment of error, Ms. Scott contends that the Adamses built the Agnes Street home and therefore they knew or should have known of the defects in the home that caused mold to grow. In support of her position, Ms. Scott included the affidavit of Mr. Driskill, the mold specialist who assessed the Agnes Street home. In his affidavit, Mr. Driskill stated that he found mold in the home and determined that negative air pressure was causing excessive air infiltration, which caused mold to grow. He determined that two roof mounted electric ventilators and an insufficient return air design in the upstairs of the home were the source of the negative air pressure. He opined that a property owner, especially one that built the home, would have constructive knowledge of this condition. Ms. Scott also introduced the affidavit of Randy Galliano, who has an HVAC certification and a Louisiana HVAC Contractors license. Mr. Galliano stated that in his opinion, the HVAC system was improperly installed or repaired and the Adamses, as the agents of the installer and/or repairperson, should have known that the installation was faulty.

As pointed out by this court in **Stuckey**, La. R.S. 9:3221 was designed to relieve the owner of some of the burdens imposed upon him by law in cases where he had given dominion or control of his premises to a tenant under a lease, and the

phrase "should have known" should not be construed to impose expansive burdens upon the owner lessor, and most specifically should not include any duty to inspect the premises. **Stuckey**, 21 So.3d at 978. Considering the purpose of La. R.S. 9:3221, the conclusions by Mr. Driskill and Mr. Galliano that since the Adamses built the home, they should have known of these defects fall short of the factual support required to establish the existence of a genuine issue of fact when there was no evidence of mold for the eight years that the Adamses lived in the home, and Ms. Scott did not discover evidence of mold until more than seventeen months after moving in the home.

In the alternative, Ms. Scott contends that even if the Adamses were previously unaware of the defects that caused the humid conditions in the home, they were aware of the defects in the summer of 2016 when Ms. Scott complained to Mr. Adams that the air conditioner was not cooling properly. At the time, Ms. Scott made Mr. Adams aware of problems she was having with her air conditioner, and Mr. Adams sent Robert Arce out to repair the air conditioner. She contends that Mr. Arce did not properly repair the air conditioner, causing mold to grow, and that Mr. Arce was an agent of Mr. Adams whose knowledge was imputed to Mr. Adams. Therefore, Mr. Adams knew or should have known that the air conditioner was not properly repaired. We find no merit to this argument. Ms. Scott presented insufficient evidence directly linking the presence of mold to her prior complaint regarding the air conditioner. (See **Montgomery** and **Stuckey**, both summary judgment cases considering La. R.S. 9:3221 where this court determined that prior complaints of water leaks did not create a genuine issue of fact regarding whether the landlord knew or should have known about mold when there was no direct evidence linking the presence of mold to prior reports of water leaks. **Montgomery v. Garry Lewis Properties**, 2017-1720 (La. App. 1st Cir. 8/10/18), 256 So.3d 391, 398, writ denied, 2018-1585 (La. 12/17/18), 258 So.3d 598, cert. denied, ___ U.S.

___, 139 S. Ct. 2673, 204 L. Ed. 2d 1077; **Stuckey**, 21 So.3d at 976.) While Ms. Scott complained about the air conditioner to Mr. Adams, she never suggested that the problems she was having with the air conditioner were causing mold. Ms. Scott's prior complaints about the air conditioner a year earlier that were promptly addressed by Mr. Adams are insufficient to impose actual or constructive knowledge on the Adamses that there was a defect causing mold in the home, especially since Ms. Scott did not further complain about the air conditioner to the Adamses after it was repaired by Mr. Arce.

At trial, Ms. Scott would have the burden of proving that the Adamses should have known about a defect in the home that caused mold to grow or failed to remedy the problem upon notice. Ms. Scott offered no specific facts to contradict the evidence offered by the Adamses that they neither knew or should have known about mold in the home or any defect in the home that would cause mold to grow prior to receiving Ms. Scott's July 8, 2017 text. At best, she proved that it is possible that the Adamses should have known of the potential for mold to grow. See **Stuckey**, 21 So.3d at 979. In the lease agreement, Ms. Scott assumed responsibility for the condition of the Agnes Street home and waived her right to bring claims for injury caused by defects in the home against the Adamses. The summary judgment evidence revealed that the exceptions in La. R.S. 9:3221, which would allow Ms. Scott to assert liability to the Adamses, are not applicable herein. Accordingly, no genuine issue of fact remains and the trial court properly granted summary judgment in favor of the Adamses.

## CONCLUSION

For the foregoing reason, the judgment of the trial court is affirmed. All costs of the appeal are assessed to plaintiff-appellant, Ms. Sabrina Scott.

**AFFIRMED.**